PROFESSIONAL ECONOMICS, INC. *vs.* PROFESSIONAL ECONOMIC SERVICES, INC. & others.[1]

Middlesex. February 13, 1981. — June 15, 1981.

Present: HALE, C.J., CUTTER, & PERRETTA, JJ.

*Trade Name. Unfair Competition. Consumer Protection Act,* Trade name.

In an action by a corporation providing financial services to professional people to enjoin another corporation providing similar services from using the words "professional economics" in its name, there was insufficient direct or circumstantial evidence to warrant a finding that the words had acquired a secondary meaning [73-79]; that there was a secondary meaning "in the making" [79]; that the defendant had engaged in palming off [79-80]; or that the defendant's use of the words in its name constituted an unfair business practice under G. L. c. 93A, § 11 [80-81].

BILL IN EQUITY filed in the Superior Court on January 20, 1971.

The suit was heard by *Good,* J.

*Walter J. Connelly* for Professional Economic Services, Inc.

*Roland E. Shaine* for the plaintiff.

PERRETTA, J. The plaintiff, Professional Economics, Inc. (PEI), brought an action in the Superior Court seeking to

---

[1] Herbert F. Gold, Vincent P. Bowhers, John Dillon, and Joseph Lucier. These persons were named as defendants as they "have been empowered by Professional Economic Services, Inc. to conduct business within Massachusetts under the name Professional Economic Services, Inc." None of them appealed from the judgment against them. However, in reversing the judgment against Professional Economic Services, Inc., we have nonetheless also granted the codefendants relief. Cf. *Merchants Discount Corp.* v. *Federal St. Corp.,* 300 Mass. 167 (1938); *E & K Agency* v. *Van Dyke,* 60 N.J. 160 (1972).

enjoin permanently Professional Economic Services, Inc. (PES), from using the words "professional economics" and the name "Professional Economic Services, Inc." in connection with its business operations in Massachusetts. PEI alleged, and the judge found, Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974), that the words in question had acquired a secondary meaning, *American Waltham Watch Co.* v. *United States Watch Co.*, 173 Mass. 85 (1899); *President & Trustees of Colby College* v. *Colby College-New Hampshire*, 508 F.2d 804 (1st Cir. 1975), and that PES' use of them constituted an unfair business practice. G. L. c. 93A, § 11. See *PMP Associates, Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593 (1975); *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498 (1979). We reverse the judgment which granted PEI the relief it sought.

1. *The facts.* The findings and rulings of the judge, a transcript of the evidence, and numerous exhibits are in the record before us. We recite the facts as the judge found them, supplemented by undisputed portions of the evidence.

PEI was incorporated in Massachusetts in September of 1967, for the purpose of providing financial counselling to professional people, particularly doctors and dentists. As of 1969, its place of business was located on Boylston Street in Brookline. The company was the brainchild of one Jerry Weinberg, a former insurance salesman who perceived a potential market for comprehensive economic planning services independent of any single insurance company or other investment concern. Through PEI, Weinberg offered advice regarding professional corporations, estate planning, tax shelters, insurance, and investments. In appropriate instances, he also arranged accounting and billing systems for PEI clients. Fees for these services were computed on the basis of a percentage of the value of each PEI customer's portfolio.

PEI was organized with a very modest amount of capital and with the hope that various forms of financing could be obtained. Its business operations were to be conducted by way of a "franchise — sub-franchise system."

A similar but not identical scheme occurred to one Herbert Myers, a general agent for the John Hancock Mutual Life Insurance Company (Hancock) in New York City, and in 1966, he formed Medical Planning Services.[2] That *corporate name was changed to PES in 1968,*[3] and within a few days after its name change, PES became a Hancock subsidiary with its base of operation located in New York City. PES, like PEI, conducted its business under a "franchise — sub-franchise system," appealing to the same clientele, doctors and dentists. Unlike PEI, however, PES had the financial backing of Hancock and, thus, had access to substantial capital.

In August of 1970, PES, by means of its franchise system, brought its business to Massachusetts. PEI became aware of this fact when the Boston Globe featured an article on the type of services offered by PES shortly after it commenced its operations. Counsel for PEI complained in writing to PES about the similarity of names and demanded that PES refrain from further use of the words "Professional Economics Services" in its business and advertising. PES did not respond to those writings, and PEI commenced this action in 1971. Its request for injunctive relief pending trial was denied. Trial of the action did not start until June of 1977. During this time, both PEI and PES continued their business operations. At some point, a PES franchisee, one

---

[2] Myers tied his operations to a specific insurance company and generated fees by consummating policy sales.

[3] The judge made the following finding concerning the name change to PES. "No direct evidence was received as to the reason for Myers' changing the name of Medical to [PES]. I infer that Myers, as a former resident of Massachusetts and insurance salesman of [Hancock] came to know of the plaintiff corporation and its name, as he undertook to develop the business of Medical, and that he liked the name and concluded he could and would use the name Professional Economic Services, Inc. in New York with impunity and without consulting with the plaintiff PEI." Our review of the record leads us to conclude that this finding is based on speculation and conjecture and is clearly erroneous. *Marlow* v. *New Bedford,* 369 Mass. 501, 508. We disregard it in our consideration of this appeal. See also, part two of this opinion, *infra*.

Gold, moved into the same office building in which PEI was located, but the name of Gold, and not PES, appeared on the building directory.[4] The 1977 Boston telephone book listed Professional Economic Services of Boston (Gold's PES franchise) immediately beneath the listing of PEI.

As of the time of trial, PEI had not grown to any substantial extent, and Weinberg had practically brought PEI operations to a halt. This was in part due to the fact, as found by the judge, that PEI's financial base did not allow for survival despite slow development and "an uncertain period of financial stress and hardship . . . in the state of the economy in Massachusetts and the country as a whole."[5] PES, on the other hand, "could survive the uncertainties in the venture capital field and delayed development of business" because of its support from Hancock.

The judge found that PEI had become known as the "new and growing company" in the area of financial advising among medical professionals in Massachusetts. He further found that this reputation was "necessarily limited but only to the extent any newly organized business is limited in the early stages of organization and development." He concluded that, to that limited "extent," PEI had acquired a secondary meaning. He also concluded that PES's actions were deliberate and wilful and constituted an unfair trade practice. PES was permanently enjoined from any further "use of the words 'Professional Economics' or the name 'Professional Economic Services, Inc.'" PEI was awarded nominal damages and counsel fees.

2. *Secondary meaning.* Neither party contends that the words "professional economics" are other than descriptive

---

[4] The judge found and ruled that PES made this move "deliberately and with the intent to confuse the public and damage the integrity of [PEI's] corporate name and its business operations." This finding and ruling is erroneous because there is no evidence to support it. See part five of this opinion, *infra*.

[5] The judge also found that another reason for PEI's inactivity was "no doubt . . . the PES activities complained of" and Weinberg's "understandable reaction" to them.

of the type of financial planning services both offer to provide. Consequently, unless these words have acquired a secondary meaning, they are neither registerable under the Lanham Trade-Mark Act, 15 U.S.C. § 1052(f) (1976),[6] see also G. L. c. 110B, inserted by St. 1973, c. 897, § 5,[7] nor are they protectible in a common law infringement action. *American Waltham Watch Co.* v. *United States Watch Co.,* 173 Mass. 85 (1899). *C.A. Briggs Co.* v. *National Wafer Co.,* 215 Mass. 100 (1913). *Union Oyster House* v. *Hi Ho Oyster House,* 316 Mass. 543 (1944). *Massachusetts Mut. Life Ins. Co.* v. *Massachusetts Life Ins. Co.,* 356 Mass. 287 (1969).

"[I]f a given symbol or word is *not* inherently distinctive, it can be registered or protected as a mark only upon proof that *it has become distinctive.* This acquisition of distinctiveness is referred to as 'secondary meaning.' For symbols which are not inherently distinctive, acquisition and priority of ownership is determined by looking to when, where

---

[6] See *Trak, Inc.* v. *Brennan Ski KG,* 475 F.Supp. 1076, 1079 (D. Mass. 1979); *Professional Economics, Inc.* v. *Professional Economic Services, Inc.,* 205 U.S.P.Q. 368, 375 (BNA 1979). PES attempted to register its service mark "Professional Economic Services" on the Principal Register on August 18, 1969. It was refused on the grounds that the mark was merely descriptive. PES then amended its petition and obtained registration on the Supplemental Register. PEI challenged the registration in a cancellation action before the Trademark Trial and Appeal Board of the Patent and Trademark office, asserting, inter alia, that the name "Professional Economics" "was and is a common descriptive name for the services claimed." *Id.* at 374. The Board agreed that the name was descriptive and not used exclusively by PES, and therefore, it was not in "lawful use" at the time of the registration. The Board also found that the two names were "confusingly similar." *Id.* at 376. It made no findings as to secondary meaning, but it commented that no exclusive rights could exist in the words absent secondary meaning. *Id.* at 375. The Board cancelled PES' registration. While not binding on this court, Patent Office decisions are entitled to "considerable weight" and "most respectful consideration." *Wilco Co.* v. *Automatic Radio Mfg. Co.,* 255 F.Supp. 625, 627 (D. Mass. 1966). *Carling Brewing Co.* v. *Philip Morris, Inc.,* 277 F.Supp. 326, 333 (N.D. Ga. 1967).

[7] The judge properly refused to grant PEI relief under G. L. c. 110B, § 12, because PEI never attempted to register its mark pursuant to § 2 subsequent to the effective date, April 1, 1974, of c. 110B.

and how secondary meaning was established in the symbol" (emphasis original). 1 McCarthy, Trademarks and Unfair Competition § 15:1 (1973). See also G. L. c. 110B, § 3(*e*). Whether a secondary meaning became attached to the words "professional economics," as used by PEI, is a question of fact, *Jenney Mfg. Co.* v. *Leader Filling Stations Corp.*, 291 Mass. 394, 399 (1935), which it had the burden of proving. 1 McCarthy § 16:11. Secondary meaning can be established by direct evidence, testimony of buyers of the offered product as to their state of mind, and circumstantial evidence, that is, evidence of various factors from which buyer association may be logically inferred. *President & Trustees of Colby College* v. *Colby College-New Hampshire*, 508 F.2d 804, 807-810 (1st Cir. 1975). Lunsford, The Mechanics of Proof of Secondary Meaning, 60 Trademark Rep. 263, 265-268 (1970). 1 McCarthy §§ 15:12-15:20. 2 Nims, Unfair Competition and Trade-Marks § 334 (4th ed. 1947). Employing the analysis provided by these authorities, we consider the evidence presented by PEI.

a. *Direct evidence.* Five witnesses, dentists and doctors, all of whom were either clients or potential clients of PEI, testified as to what "professional economics" meant to them. Four of them stated that those words meant either "PEI" or "Jerry Weinberg's company." The fifth witness stated that the words connoted "an organization . . . [which] serves the purpose of financial guidance or investment." We note that three of these witnesses had been clients of Weinberg from his insurance salesman days, the fourth was new to the Boston area and had met Weinberg at a meeting prearranged by a secretary at the hospital where the witness was newly employed, and the fifth obtained Weinberg's name from his (the witness') wife, who was also a doctor. "[W]hile it is clear that there is no necessity that a *majority* of concerned customers associate the mark with a single source, how much less than a majority which will suffice is not clearly set down in the cases" (emphasis original). 1 McCarthy § 15:13. Nonetheless, we have no difficulty in concluding that this evidence hardly demon-

strated that PEI had succeeded in creating a congruence in the minds of an appreciable number of medical professionals in Massachusetts between its financial service and the words "professional economics." Compare *President & Trustees of Colby College* v. *Colby College-New Hampshire*, 508 F.2d at 808-809. See also *Union Carbide Corp.* v. *Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976); *North Carolina Dairy Foundation, Inc.* v. *Foremost-McKesson, Inc.*, 92 Cal. App. 3d 98 (1979).

PEI presented twelve other witnesses who stated, essentially, that "professional economics meant Weinberg or his firm." However, these witnesses were not actual or potential clients; rather, they were tax attorneys, stockbrokers, accountants, and investment dealers with whom Weinberg either dealt directly or to whom he referred his clients. Because such testimony "does not necessarily reflect the views of the consumer class," it is generally recognized as having little probative value. 1 McCarthy § 15:12, and authorities therein collected. See also *Re Semel*, 189 U.S.P.Q. 285 (BNA 1975).

We turn now to PEI's circumstantial evidence.

b. *Length of use.* Secondary meaning can be established by evidence of long and exclusive use of the words by the first user. Lundsford, 60 Trademark Rep. at 267. 1 McCarthy § 15:20. 2 Nims § 334. "[T]here is no rule as to the length of time required. It must be governed by the conditions in each case, depending on the locality, the nature of the business, and the kind of goods involved, and the use to which the name has been put by plaintiff." 1 Nims § 38a. While secondary meaning has been developed in as short a period as six months, *Great Scott Food Mkt., Inc.* v. *Sunderland Wonder, Inc.*, 348 Mass. 320, 323-324 (1965), such an occurrence is rare. It is also typically marked by unusual circumstances, such as exceptionally rapid growth, not experienced by PEI, and an unusually aggressive promotional scheme, not conducted by PEI. The evidence in the present case falls far short of showing that PEI had ex-

clusive use of the words in issue for its services over a reasonable period of time before PES came on the scene.

PEI used the words "professional economics" in its name, without competition, from the date of its incorporation, September 27, 1967, until PES began its Massachusetts operations in April of 1969. During that time span, PEI's driving force, Weinberg, became ill, and PEI's operations came to a standstill for a few months. Thus, PEI had first and exclusive but not continuous use of the words "professional economics" in identifying its products for approximately eighteen months. We are unable to conclude that PEI has shown that for a reasonable period of time it had exclusive use of the words. Compare *President & Trustees of Colby College* v. *Colby College-New Hampshire,* 508 F.2d at 807. This is particularly so when we consider its promotional endeavors during this time frame. See, e.g., *Orion Pictures Co.* v. *Dell Publishing Co.,* 471 F.Supp. 392, 396 (S.D.N.Y. 1979).

c. *Promotional activities.* In determining whether secondary meaning has attached, it is relevant to consider whether there has been "extensive and substantial advertising of the mark to identify the specific product as coming from a particular source." Lundsford, 60 Trademark Rep. at 267. See also *President & Trustees of Colby College* v. *Colby College-New Hampshire,* 508 F.2d at 808; 1 McCarthy §§ 15:18, 15:19. The evidence shows that during 1968 through 1969, PEI spent only about $250 in advertising. Weinberg placed advertisements in numerous newspapers, and he mailed out announcement cards to his insurance clients and various associates. In the summer of 1970, he also mailed out weekly brochures. After the Globe article featuring PES appeared and when the request for injunctive relief pending trial was denied, Weinberg became disheartened and discontinued his advertising campaign. He did, however, engage in other limited promotional activities. He continued with his newsletter to PEI customers, he spoke at professional conventions, and he distributed his business cards. PEI records show that from 1968 to 1974,

about $23,000 were spent on promotion and travel, a figure which included expenses incurred in servicing established clients. The minor expenditure on promotional activities and advertising does not warrant inferences favorable to PEI. See *President & Trustees of Colby College* v. *Colby College-New Hampshire*, 508 F.2d at 807.

PEI carried on about ninety-five percent of its business in Massachusetts, with some operations in eleven other States and Puerto Rico. Most of its clients lived and worked in the greater Boston area. PEI never employed more than a dozen or so people, including part-time employees. The judge found that PEI did not experience substantial success in establishing franchises. He also found that "PEI had not grown to any substantial extent; Weinberg had practically brought PEI operations to a halt. PEI's financial picture was modest, to say the least." See 1 McCarthy § 16:17. Compare *Great Scott Food Mkt., Inc.* v. *Sunderland Wonder, Inc.*, 348 Mass. at 323-324.

d. *Buyer confusion.* PEI's failure to show secondary meaning by either direct or circumstantial evidence is not cured by its evidence of what it regards as buyer confusion and deception. Evidence of confusion cannot be a substitute for a finding of secondary meaning: to hold otherwise is to mix up cause and effect. *Spangler Candy Co.* v. *Crystal Pure Candy Co.*, 235 F.Supp. 18, 27 (N.D. Ill. 1964). See 1 McCarthy § 16:4. See also Note, Trade Name Protection: Relaxation of the 'Secondary Meaning' Requirement and Its Implications, 1962 Duke Law J. 307 (1962). We will, however consider PEI's evidence on this point in relation to its claim under G. L. c. 93A, § 11, in part five of this opinion, *infra.*

e. *Intentional copying.* As noted earlier, see note 3, *supra,* the judge found that Myers "liked the name and he concluded he could and would use the name Professional Economic Services, Inc. in New York with impunity and without consulting with the plaintiff PEI." Even were there a sufficient basis for the finding, we reject any notion "that intentional copying of a descriptive phrase raises a

presumption that the phrase had acquired a secondary meaning" because any such argument is "pure bootstrap." *Devcon Corp.* v. *Woodhill Chem. Sales Corp.*, 455 F.2d 830, 833 (1st Cir. 1972) (concurring opinion, Aldrich, J.).

Consideration of PEI's direct evidence as well as the above cumulative factors lead us to conclude that PEI failed to prove that its name had acquired secondary meaning.

3. *Secondary meaning in the making.* We are mindful that there is recognition in some jurisdictions of "about-to-be-acquired secondary meaning" or secondary meaning "in the making" for purposes of "preventing intentional attempts . . . to capitalize on the efforts and goodwill of others." *Orion Pictures Co.* v. *Dell Publishing Co.*, 471 F.Supp. at 396, and authorities therein collected. See also Note, 1962 Duke L. J. at 315-317 (1962). Indeed, this concept may well be what the judge had in mind when he concluded that PEI's reputation was "necessarily limited . . . to the extent any newly organized business is limited in the early stages of organization and development" but that its name had acquired secondary meaning to that "extent." We need not consider whether the reasoning of these authorities is persuasive and should be applied to the present case because even if it were, PEI would not be aided. When the evidence of secondary meaning is reconsidered in relation to whether there was secondary meaning in the making, it is apparent that PEI's efforts and good will were far too minimal to invoke protection under any such theory. Compare *Orion Pictures Co.* v. *Dell Publishing Co.*, 471 F. Supp. at 396.

4. *Palming off.* Palming off has been defined as a producer's "attempt to induce customers to believe that his products are actually those of another." *Remco Indus., Inc.* v. *Toyomenka, Inc.*, 286 F.Supp. 948, 954 (S.D. N.Y.), aff'd, 397 F.2d 977 (2d Cir. 1968). In Massachusetts, a plaintiff may show unfair competition by either secondary meaning or palming off. *Mann* v. *Parkway Motor Sales, Inc.*, 324 Mass. 151, 156 (1949). *Pic Design Corp.* v. *Bearings Specialty Co.*, 436 F.2d 804, 807 (1st Cir. 1971), and cases cited. PEI introduced no evidence to show palming

off, nor does the evidence of PES's activities give rise to an inference of palming off.

5. *Unfair trade practices, G. L. c. 93A, § 11.* The judge's findings and rulings indicate that his conclusion that PES had engaged in an unfair business practice was based upon his erroneous findings that there had been buyer confusion and his improper application of secondary meaning "in the making," which we have already rejected. "It remains to ask whether, on the facts found, [PES] has committed a transgression which exposes it to a c. 93A claim, i.e., did it do anything unfair or deceptive?" *Levings* v. *Forbes & Wallace, Inc.,* 8 Mass. App. Ct. at 503. In answering this question, we look to those factors set out in 29 Fed. Reg. 8325, 8355 (1964), and quoted in *PMP Associates, Inc.* v. *Globe Newspaper Co.,* 366 Mass. at 596: "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen). If all three factors are present, the challenged conduct will surely violate Section 5 [Federal Trade Commission Act] . . . if it is exploitive or inequitable and if, in addition to being morally objectionable, it is seriously detrimental to consumers or others."

PEI not only failed to show secondary meaning or palming off, it did not present any appreciable evidence of buyer confusion. We are not inclined to give any weight to the demonstrated incidents of actual confusion caused by the telephone listings and addresses, the only points upon which confusion was claimed. The bulk of the incidents of mistake among the two companies involved letters or telephone calls from PES's New York office to its Massachusetts franchise, which instead reached PEI. There is no evidence of items meant for PEI reaching PES, nor is there evidence of any PEI actual or prospective clients being misled to PES's door. See *American Waltham Watch Co.* v. *United States Watch Co.,* 173 Mass. at 87. Moreover, as found by

the judge, "[t]here is no evidence that PEI, by reason of PES activity, was rebuffed by its own customers, or that PES stole actual customers from PEI, or that PES, if it did business with PEI customers, deliberately did a bad job and thereby damaged PEI's reputation."

Nor do we make much of Gold's moving his PES franchise office to the same building PEI occupied. (See note 4, *supra*.) No doubt such close proximity can be a highly aggravating circumstance, see *S.M. Spencer Mfg. Co.* v. *Spencer*, 319 Mass. 331, 338-339 (1946), but, as noted immediately above, it caused no buyer confusion, and Gold listed his own name, not that of PES, on the building directory board.

In view of all the facts and circumstances, we conclude that if PES's conduct was of such "a level of rascality that would raise an eyebrow" of some, it was not sufficient to do so to those "inured to the rough and tumble of the world of commerce." *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. at 504.

6. *Conclusion.* The order awarding counsel fees to PEI under G. L. c. 93A, § 11, and the judgment of the Superior Court are reversed and a new judgment is to be entered dismissing the action as to all the defendants. Neither party is to have costs of appeal.

*So ordered.*