NEC ELECTRONICS, INC., Plaintiff,

v.

NEW ENGLAND CIRCUIT SALES,
INC., Defendant.

Civ. A. No. 86–3196–WF.

United States District Court,
D. Massachusetts.

Aug. 29, 1989.

Laurie S. Gill, Palmer & Dodge, Boston, Mass., for plaintiff.

Jason Honeyman, A. Jason Mirabito, Edward Robinson, Gaston, Snow & Ely Bartlett, Boston, Mass., for defendant.

---

## MEMORANDUM AND ORDER

WOLF, District Judge.

In this action, plaintiff NEC Electronics, Inc. ("NEC") charges that the defendant New England Circuit Sales, Inc.'s ("New England") use of the "NECS" letters in its logo constitutes trademark infringement in violation of 15 U.S.C. § 1114, constitutes a false designation of origin and unfair competition in violation of 15 U.S.C. § 1125, and constitutes an unfair and deceptive trade practice in violation of Mass.Gen.L. ch. 93A. NEC seeks injunctive relief against New England's use of, or sale of, equipment bearing the marks "NEC" or "NECS," the delivery to plaintiff for destruction all material bearing those marks, an accounting of gains from the actions in question, and costs, attorneys fees and treble damages under 15 U.S.C. § 1117 and Mass.Gen.L. ch. 93A.

Discovery has been conducted. New England has moved for summary judgment on all counts. A hearing on that motion has been held. The court concludes that defendant is entitled to summary judgment.

## I. Facts

Unless otherwise indicated, the following facts are undisputed. NEC is the federally registered owner of the trademark and service mark "NEC" for electronic components. See Exhibit A hereto. NEC is engaged in the business of manufacturing, importing, marketing, distributing and selling electronic components, including integrated circuits, or computer chips, all of which bear the registered trademark "NEC."

New England Circuit Sales, Inc. is an independent broker of computer chips. It sells the products of many manufacturers. New England began its operations in January, 1980, choosing its name at that time to reflect the nature of its business and the geographic region in which it operated. Affidavit of Henry Bertolon, President, New England Circuit Sales, Inc. ¶ 13 (December 3, 1987). Its initial logo consisted of an outline of the New England states enclosing the company's initials, "NECS."

Next to this outline were the words "New England Circuit Sales." See Exhibit B hereto and Bertolon Aff., Exh. A. In 1984, New England revised its logo by dropping the map outline and switching to a more modern typeface and graphic arrangement. See Exhibit C hereto. New England's President, Henry Bertolon, states that he decided to drop the map outline because he was doing substantial business in other parts of the country. Bertolon Aff., ¶ 13. In most instances in which New England uses the initials "NECS" the words "New England Circuit Sales, Inc." appear next to the letters. There is some literature in which New England refers to itself as "NECS," but that literature in other places also prominently identifies the company as "New England Circuit Sales, Inc." See, e.g., Exhibits D and E.

NEC sells only NEC-brand products. Ninety-eight percent of its sales are to original equipment manufacturers ("OEMs"), who in turn incorporate the NEC products into a wide variety of equipment, including computers, telecommunications systems, medical devices, automobiles, calculators and numerous other industrial and consumer products. Affidavit of Robert G. Commins, Director of Sales Administration, NEC Electronics, Inc. ¶ 12 (January 15, 1988). NEC sells to OEMs through authorized distributors, who carry and sell brands other than NEC, and through independent sales representatives and NEC-employed sales staff. Commins Aff., ¶ 10. NEC's chip sales are part of a comprehensive business strategy that involves engineering and support services, extensive free technical seminars, technical support and broad warranty-related services and education. NEC Ans. to Int. ## 1, 7.

By contrast, seventy percent of New England's chip sales are to other independent chip distributors. Bertolon Aff. ¶¶ 17, 18. Approximately thirty percent of New England's sales are to OEMs. Id. ¶ 19. Only 1–2% of these sales involve NEC-brand chips. Id. ¶ 31. In addition, New England provides no seminars or technical support. Defendant's Memorandum in

Support of its Motion for Summary Judgment at 9. The only warranty it provides is that if a chip is defective it can be returned. *Id.* ¶ 36.

Both companies have advertised in the same trade publications, including *Electronic News, Electronic Buyers News,* and *Electronic Purchasing.* Bertolon Aff. ¶ 22; Affidavit of Dan E. Anderson, Director of Corporate Communications, NEC Electronics ¶ 4 (January 5, 1988). Both companies use direct mail solicitation and conduct extensive business by phone. Bertolon Aff. ¶¶ 25, 33; Anderson Aff. ¶ 10.

There is no evidence that any potential customer has actually confused New England with NEC, or been confused about whether New England is associated with NEC, during the approximately five years that the logos at issue in this case have been in the marketplace together.

Additional relevant facts are discussed in the following conclusions of law.

## II. Conclusions of Law

### A. *Summary Judgment Standard*

The standard for granting a summary judgment motion in the First Circuit is "well settled." *Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 815 (1st Cir.1987). *See also Astra Pharmaceutical Products v. Beckman Instruments,* 718 F.2d 1201, 1204 (1st Cir.1983); *Pignons S.A. de Mecanique v. Polaroid Corp.,* 657 F.2d 482 (1st Cir.1981). In evaluating a summary judgment motion in a trademark infringement action, the court must determine whether:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). Although the moving party carries the burden of showing that it is entitled to summary judgment, Rule 56 sets forth a bifurcated standard under which the opposing party must establish the existence of a fact that is both "genu-ine" and "material." *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

A factual dispute is material if it "affects the outcome of the litigation" and genuine if manifested by "substantial" evidence "going beyond the allegations of the complaint." *Volkswagenwerk,* 814 F.2d at 815 (quoting *Astra,* 718 F.2d at 1204). *See also Pignons,* 657 F.2d at 486 (quoting *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976)). Moreover, in deciding a motion for summary judgment, the court must view the record and draw the inferences most favorable to the opposing party. *Volkswagenwerk,* 814 F.2d at 815.

■ Where, as here, the nonmoving party will bear the burden of proof on an issue at trial, the moving party need not produce evidence negating the claim that there is a material issue in genuine dispute. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party's burden is to point out to the district court "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2553.

" 'While infringement and unfair competition cases often present factual issues that render summary judgment inappropriate, this is not invariably so.' " *Boston Athletic Association v. Sullivan,* 867 F.2d 22, 24 (1st Cir.1989) (quoting *Kazmaier v. Wooten,* 761 F.2d 46, 48–49 (1st Cir.1985)). Indeed, the First Circuit has often found summary judgment to be warranted in such cases. *See e.g., Pignons, supra; Astra, supra; Volkswagenwerk, supra; Boston Athletic Association, supra.*

The evidence in the instant case has been fully developed through discovery. The court, rather than a jury, is the trier of fact concerning plaintiff's claims. The court has examined the evidence in the light most favorable to plaintiff. Nevertheless, the court concludes that defendant is entitled to summary judgment.

### B. *The Federal Infringement and Unfair Competition Claims*

Plaintiff's federal claims are based upon 15 U.S.C. §§ 1114(1) and 1125. Section

1114(1) proscribes unauthorized use of a registered mark in a manner "likely to cause confusion, or to cause mistake, or to deceive." Section 1125 is broader than § 1114 in the scope of unfair competition it prohibits, but in a trademark case such as this a charge of unfair competition must also be supported by a showing of a likelihood of confusion. *Pignons*, 657 F.2d at 493; *Astra*, 718 F.2d at 1209. Thus, likelihood of confusion is an essential element of plaintiff's federal claims.

■ In assessing the likelihood of confusion, the Court of Appeals has regularly looked at eight factors: (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting the mark; and (8) the strength of the plaintiff's mark. *Pignons*, 657 F.2d at 487. *Astra*, 718 F.2d at 1205; *Boston Athletic Association*, 867 F.2d at 29. No single factor is determinative, but each must be considered. *Volkswagenwerk*, 814 F.2d at 817.

### 1. Similarity of Marks

■ Plaintiff contends that the marks should be considered essentially identical because both use "NEC" in capital letters and similar type. Plaintiff asserts that the addition of the "S" is not likely to prevent confusion because an "S" is commonly placed on the end of a word to make a plural or possessive form.

NEC's focus, however, is too narrow. It is axiomatic that " 'similarity is determined on the basis of the total effect of the designation, rather than on a comparison of individual features.' " *Astra*, 718 F.2d at 1205 (quoting *Pignons*, 657 F.2d at 487). A corollary of this is that "otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer." *Id.*

Thus, in *Pignons*, the court found that Polaroid's use of the "Alpha" mark on its cameras was not likely to be confused with Pignons' "Alpa" mark for its cameras in part because in Polaroid's advertising the word "Alpha" always appeared in close proximity with the prominent Polaroid name. 657 F.2d at 487. Similarly, in *Astra*, a likelihood of confusion concerning the dual use of the identical term "Astra" was not found, in part because the defendant included its house name, "Beckman," on another part of the machine in question. 718 F.2d at 1205.

The same conclusion is appropriate in the instant case. There are aspects of the NEC logo and New England's use of "NECS" that are similar. New England, however, usually has its name, "New England Circuit Sales," next to the NECS logo, and in all other cases prominently identifies itself as New England Circuit Sales, Inc. in literature which uses the acronym "NECS." In these circumstances, notwithstanding the similarity of the letters used by plaintiff and defendant, the total effect of the marks does not militate in favor of finding that purchasers are likely to mistake New England for NEC.

### 2. Similarity of Goods

Although NEC provides a broader range of products and services than New England, both sell computer chips. Less than two percent of New England's sales involve chips manufactured by NEC. Thus, the parties generally sell similar goods, and in limited circumstances sell the same NEC goods. This weighs in favor of a finding of likelihood of confusion. *Volkswagenwerk*, 814 F.2d at 818.

### 3–5. Channels of Trade, Advertising, And Prospective Customers

The First Circuit generally analyzes the related factors of channels of trade, advertising, and classes of prospective customers together. *See Pignons* 657 F.2d at 488; *Volkswagenwerk*, 814 F.2d at 818.

Superficially, it appears that there are similarities in the parties' channels of trade. Both use outside salesmen, direct mail, and advertising. In varying degrees, each company sells to OEMs. However, a closer inspection of these considerations re-

veals that none of these similarities is likely to result in confusion.

"If a likelihood of confusion exists, it must be confusion of some relevant person, [such as] a purchaser or potential customer." *Astra*, 718 F.2d at 1206. NEC sells only to OEMs. Seventy percent of New England's sales are to other independent chip distributors; only thirty percent are to OEMs. More importantly, New England is interested in individual sales of components and deals with OEMs' purchasing department specialists or semiconductor buyers. Bertolon Aff., ¶¶ 21 & 53. NEC, however, is oriented toward the sale of large-scale systems and has extensive person-to-person contact with OEMs' engineers and technical specialists. NEC Ans. to Interrog. # 7 at 7. Thus, although the parties may each deal with the some of the same companies, there is no significant likelihood of confusion among purchasers because each party deals with different departments and individuals. *See Astra*, 718 F.2d at 1207 ("hospital community" targeted by both parties "not a homogeneous whole but is composed of separate departments with diverse purchasing requirements, which, in effect, constitute different markets for the parties' respective products").

Any potential for confusion is further diminished by the nature of the goods NEC sells and the nature of its sales effort. "[T]here is always less likelihood of confusion where goods are expensive and purchased after careful consideration." *Astra*, 718 F.2d at 1206. *See also Pignons*, 657 F.2d at 489. NEC sells to OEMs through authorized distributors and sales representatives and offers technical and engineering education and services to its prospective customers. This effort indicates that the total price of the items NEC seeks to sell is significant; that decisions concerning such purchases are made carefully by sophisticated purchasers; and that, therefore, potential NEC purchasers are unlikely to confuse NEC and New England. *See Astra* 718 F.2d at 1206; *Pignons*, 657 F.2d at 488.

Similarly, New England's minimum order is $200, *see* Bertolon Aff., Exh. F (advertising fliers), and the OEMs' to which it sells are also generally sophisticated purchasers, unlikely to confuse New England with NEC. New England's advertisements, like NEC's, are geared toward such sophisticated purchasers. For example, New England, like NEC, advertises in specialized trade publications and New England's advertisements—particularly those listing part numbers—are obviously geared toward knowledgeable purchasers. *See* Bertolon Aff., Exh. C.

NEC contends that "representatives of the smaller and new start-up customers," who are some of New England's potential customers, "are often not familiar with the semiconductor market." Commins Aff. ¶ 40. Assuming, without deciding, that such potential purchasers may be less sophisticated than some of their longer established rivals, they are nevertheless companies who use a significant number of computer chips. These companies, therefore, are likely to be considerably more knowledgeable than the retail purchasers to which plaintiff attempts to analogize them. *Compare In re Graphics Technology Corp.*, 222 USPQ 179, 181 (TTAB 1984).

Finally, with regard to promoting themselves, the parties' advertising contrasts sharply in emphasis. New England consistently identifies itself as an independent chip broker whose specialty is quickly providing the chips of various manufacturers. *See* Commins Aff., Exh. D. NEC advertises its computer systems and stresses its full service approach. *See* Bertolon Aff., Exh. E.

The court recognizes that the parties are in the same industry, seek to sell to some of the same organizations and advertise in some of the same media. However, the nature of the products they sell, the different individuals they deal with, the sophistication of prospective customers, and the nature of their self-promotion all weigh against a finding that potential purchasers are likely to confuse New England with NEC. *See Pignons*, 657 F.2d at 489.

6. Evidence of Actual Confusion

NEC concedes that it has presented no evidence of actual confusion. Although

"[e]vidence of actual confusion is not invariably necessary to prove likelihood of confusion ..., 'absent evidence of actual confusion, when the marks have been in the same market, side by side, for a substantial period of time, there is a strong presumption that there is little likelihood of confusion.'" *Pignons*, 657 F.2d at 490 (quoting 3 R. Callman, *The Law of Unfair Competition, Trademarks and Monopolies* § 82.3(a) at 849 (3d ed. 1969)). In *Pignons*, the Court of Appeals for the First Circuit held that "[f]our years is a substantial amount of time." 657 F.2d at 490.

NEC has been in the market for at least eleven years. *See* Commins Aff. ¶ 6. New England has been in operation for nine years. *See* Bertolon Aff. ¶ 12. In 1984, New England adopted its new logo, which dropped the outline of the New England states and changed to a more modern typeface. The New England logo has been in the marketplace with the NEC mark for almost five years. Thus, in the absence of any evidence of actual confusion, there is a strong presumption that there is little likelihood of confusion among potential customers.

This presumption is reinforced in the instant case because NEC's extensive contact with its customers would likely produce evidence of actual confusion if such confusion were, in fact, occurring. NEC relies on a comprehensive sales and service approach to its business, including educational seminars, trade shows, and warranty follow-up. In addition, NEC monitors responses it receives as a result of its advertising. For example, one NEC affidavit reports more than 62,000 customer inquiries in fiscal years 1984 and 1985. Anderson Aff., ¶ 21.

Given these extensive contacts with customers and potential customers, NEC's failure to offer evidence of any instance of actual confusion strongly suggests that there is no likelihood of confusion. This is not alone fatal to plaintiff's claims, because each of the eight relevant factors must be considered. The lack of any evidence of actual confusion is, however, another

factor which suggests that plaintiff's federal claims are without merit.

### 7. New England's Intent

NEC urges the court to infer that New England began using the NECS mark in bad faith because defendant was aware of NEC's mark, it did not perform a trademark search before adopting its mark, and it chose a new type style in 1984 that is allegedly similar to NEC's.

Viewed alone, the foregoing facts may suggest bad faith. However, mere knowledge of the existence of a competitor's mark is insufficient to prove bad faith. *Ziebart International Corporation v. After Market Associates, Inc.*, 802 F.2d 220, 231 USPQ 119, 125 (7th Cir.1986). When all of the evidence in the record is considered, even in the light most favorable to NEC, it does not appear that New England's logo has been chosen or used in bad faith.

It is undisputed that the name New England Circuit Sales was chosen to describe defendant's initial market, and without regard to NEC. As defendant's market expanded, there was a valid business reason to use an acronym. However, the NECS designation is always used by defendant with the words "New England Circuit Sales, Inc." Thus, the court does not perceive any effort by defendant to palm itself off as NEC or to capitalize on any arguable potential for confusion. *See also Jordache Enterprises, Inc. v. HoggWyld, Ltd.*, 828 F.2d 1482, 4 USPQ 2d 1216 (10th Cir.1987); *IMS Ltd. v. International Medical Systems*, 1 USPQ2d 1268, 1986 WL 9692 (E.D. N.Y.1986).

### 8. Strength of NEC's Mark

The strength of a mark is determined by evaluating the length of time it has been used; the plaintiff's renown in the field; the strength of the mark in the plaintiff's field of business; and the plaintiff's actions in promoting the mark. *Boston Athletic Association*, 867 F.2d at 32 (citations omitted). As NEC has actively advertised in the New England market for eleven years, its mark must be considered "strong." It is, therefore, entitled to

greater protection than a weak mark. *See Pignons,* 657 F.2d at 492.

### 9. Assessing the Relevant Factors

Although NEC has a strong mark, it also has the burden of substantiating its trademark infringement and unfair competition claims by sufficient evidence of a likelihood of confusion. *Id.* In light of the foregoing assessment of the relevant factors, the evidence viewed in the light most favorable to NEC would not permit a reasonable trier of fact to conclude that NEC has established its federal trademark or unfair competition claims. Thus, defendant is entitled to summary judgment concerning them.[1]

### C. *The Mass.Gen.L. ch. 93A Claim*

█ NEC also claims that New England has engaged in unfair or deceptive practices under Mass.Gen.L. ch. 93A §§ 2 and 11. Plaintiff has, however, failed to offer evidence adequate to survive New England's motion for summary judgment on this claim.

In evaluating the ch. 93A claim in this case, the court must examine:

(1) Whether the practice ... is within at least the penumbra of some common-law, statutory, or other established concept of fairness;

(2) whether it is immoral, unethical, oppressive, or unscrupulous;

(3) whether it causes substantial injury to consumers (or competitors or other businessmen).

*Professional Economics, Inc. v. Professional Economic Services, Inc.,* 12 Mass. App.Ct. 70, 80, 421 N.E.2d 1221 (1981). In *Professional Economics,* the Massachusetts Court of Appeals indicated that judgment for the defendant was required in an action where plaintiff failed to show palming off and did not "present any appreciable evidence of buyer confusion." *Id. See also Sierra Marketing, Inc. v. New England Wholesale Company, Inc.,* 14 Mass. App.Ct. 976, 977, 438 N.E.2d 1101 (1982) (to recover under ch. 93A, § 11, plaintiff must demonstrate loss of money or property).

Although NEC alleges that it is suffering irreparable harm because of the sale by New England of allegedly inferior parts and services, and also seeks unspecified monetary damages for alleged lost sales, NEC has offered no evidence to support either contention. The evidence described earlier does not put New England's good faith genuinely in dispute. Nor is there any evidence of either palming off or of a likelihood of confusion. There is also no evidence indicating that either customers or NEC have been injured by New England's actions. Thus, New England is entitled to summary judgment on NEC's ch. 93A claim.

### III. Order

In view of the foregoing, New England's motion for summary judgment is hereby ALLOWED.

---

1. The court notes that NEC has in this case relied only upon the argument New England's conduct is likely to cause customers to mistake New England for NEC. NEC has not made a "promotional goods" claim contending that purchasers are likely to believe that NEC has licensed or otherwise endorsed New England's activities. The court notes, however, that to establish such a claim, NEC would have to show that prospective purchasers are likely to be mislead into thinking NEC had licensed New England, *Boston Athletic Association,* 867 F.2d at 32, or that New England was trading on NEC's mark and good will. *Id.* at 33. The instant case significantly differs from *Boston Athletic Association.* As indicated earlier, the evidence here does not suggest that the defendant has intentionally copied plaintiff's mark or tried to capitalize on plaintiff's goodwill. Nor does the evidence indicate any actual confusion or likelihood of confusion concerning a possible relationship between NEC and New England. Thus, NEC has not offered evidence that would be adequate to defeat a motion for summary judgment if NEC sought to rely on a "promotional goods" claim.

EXHIBIT A

Int. Cl.: 9

Prior U.S. Cls.: 21 and 26

United States Patent and Trademark Office

Reg. No. 1,274,127
Registered Apr. 17, 1984

## TRADEMARK
Principal Register

REGISTERED FOR A TERM OF 20 YEARS FROM Apr. 17, 1984

NEC Electronics Inc. (California corporation)
Suite 310
3055 Clearview Way
San Mateo, Calif. 94402, assignee of
Nippon Electric Co., Ltd. (Japan corporation)
Minato-ku, Tokyo, Japan

For: TRANSISTORS, THERMISTORS, DI-
ODES, RECTIFIERS, THYRISTORS, INTE-
GRATED CIRCUITS, CAPACITORS,
ELECTRONIC DISPLAY PANELS, RELAYS,
SWITCHES, GAS LASERS GENERATING A
LASER BEAM IN A SINGLE MODE, AND FAC-
SIMILE TRANSMITTERS AND RECEIVERS
FOR USE IN OFFICES, in CLASS 9 (U.S. Cls. 21
and 26).
First use Sep. 30, 1960; in commerce Sep. 30, 1960.
Owner of U.S. Reg. No. 964,056.

Ser. No. 73,745, filed Jan. 8, 1976.

J. TINGLEY, Examining Attorney

Certified to be a true copy of the registration
issued by the United States Patent & Trademark
Office, which registration is in full force
and effect. Record title is in NEC
Electronics Inc., a Calif. corp

Attest:

DEC 18 1985

Attesting Officer    Robert G. Commins    COMMISSIONER OF PATENTS

EXHIBIT B

# Are you overstocked in Semiconductors?

- Experiencing a cash drain because of excess inventory?
- Are you paying inventory taxes on surplus stock?
- Experiencing design changes leaving you top heavy in Semiconductors you don't need?

# Convert Excess Inventory to Active Cash

Call or write:

**NEW ENGLAND CIRCUIT SALES**

173 ESSEX STREET
Beverly, Massachusetts 01915

**Jeff Filmore** or **Henry Bertolon**       **Tel. 617-927-8250**

EXHIBIT C

**NEW ENGLAND CIRCUIT SALES, INC.**

Toll  Free#   1 800-922-NECS
Phone:   617-927-8250
Telex:   882685
Fax:   617-922-1341

292 Cabot Street • Beverly, MA 01915

*(pärts) • (find) • (sis' təm)*

**Parts-Find-System**

**DEFINITION:** *The only known source to over 150 million semiconductors from 3,000 suppliers worldwide. Obtainable only at New England Circuit Sales by calling Toll Free 1 800-922-NECS. Relied upon on a daily basis by purchasing agents around the world.*

EXHIBIT D p. 1

## NECS NEW ENGLAND CIRCUIT SALES, INC.

**"WE'VE GOT YOUR NUMBER"**

292 Cabot Street • Beverly, Massachusetts 01915

*Inventory List 8/8/85*

## "WE'VE GOT YOUR NUMBER"
## HAVE YOU GOT OURS? 617-927-8250

# All Devices In-Stock Now!

## Specials

*ACT FAST THESE DEVICES WON'T LAST*

| DEVICE | MFG. | DATE | PRICE |
|---|---|---|---|
| PAL10H8NC | N | 83 | 2.50 |
| HM3-7621-5 | H | 80+ | .30 |
| WD1943M-00 | WD | 83 | 1.50 |
| 2114UCB | GTE | 80 | .15 |
| SY2149H-3 | SY | 84 | 1.50 |
| SY2158B-2 | SY | 83 | 1.50 |
| AM25LS2569 | AM | 83" | 1.25 |
| AM26S10CN | T | 84 | .65 |
| 25LS22PC | AMD | 81 | 1.65 |
| D2910A | I | 84 | 1.95 |
| MPQ2907 | M | 82 | .39 |
| LM305H | N | 83 | .35 |
| LM339NA+ | N | 83 | .15 |
| MC3470AP | M | 83 | .45 |
| 27S181 | AMD | 81 | 2.00 |
| MK3884N-4 | MK | 83 | 1.85 |
| MK3887N-4 | MK | 83 | 1.85 |
| MK4027N-2 | MK | 84 | .60 |
| CD4049CN | N | 83 | .10 |
| TMS5220NL | T | 83 | 4.75 |
| MM6331-1N | MM | 83 | .39 |
| C8751H | T | 84 | 28.00 |
| 78M06C | T | 83 | .08 |

• *Subject to prior sale*

**Over 5 Million Devices In-Stock**

**Over 150 million devices listed on our PART FIND™ SYSTEM**

**If you want to save $ on your IC purchases, CALL US.**

**We stock a complete line of computer interface cables.**

**Send us your inventory list today and we'll send you a NECS baseball hat.**

**TELEX No. 882685 NECS.UD**

**FAX No. 617-922-1341**

872

Call  Today . . .

**WE'VE GOT YOUR NUMBER**  617-927-8250

## We are now selling . . .

# CABLE

*All of our cables are 100% shielded and meet or exceed UL2464 requirements.*

## HARNESSES AND FLAT CABLE

*Check this out!*

8ft. RS232(all 25 connected) ........ $9.00
8ft. Centronics Parallel Cable ...... $10.00
    (all 36 lines connected)
6ft. IBM "PC" Type Cable ........... $8.00
8ft. Null Modem Cable .............. $9.00
8ft. Modem Cable (Per ft. charge) ...... .20
Gender Changers .................... $5.80
(500 Piece Pricing – Take Advantage of it)

*Don't get all wrapped in cable problems - Call NECS*

### Custom Interface Cables

1. **Fast Turn-around** Five working days). We also offer our famous 'Quick-Turn' 2 day turn-around for a nominal fee.
2. **Custom Lengths and Configurations**
3. **Applications Engineering** to help answer questions and recommend solutions for your cable needs.

*Plenum fire-retardant cable specially quoted.*

*Why jeopardize a sale - if you are doing harnesses or flat cables, let us quote you!*

**CALL/617-927-8250**

EXHIBIT E

