The **PRESIDENT AND TRUSTEES OF COLBY COLLEGE,** Plaintiff-Appellant,

v.

**COLBY COLLEGE–NEW HAMPSHIRE, Defendant-Appellee.**

No. 74–1178.

United States Court of Appeals, First Circuit.

Argued Nov. 4, 1974.

Decided Jan. 9, 1975.

---

Vincent L. McKusick, Portland, Me., with whom Pierce, Atwood, Scribner, Allen & McKusick, Portland, Me., Everett P. Ingalls, III, Lawrence E. Spellman, and Sulloway, Hollis, Godfrey & Soden, Concord, N. H., were on brief, for plaintiff-appellant.

R. Graham McSwiney, Concord, N. H., with whom McSwiney & Jones and Hall, Morse, Gallagher & Anderson, Concord, N. H., were on brief, for defendant-appellee.

Before ALDRICH, McENTEE and CAMPBELL, Circuit Judges.

ALDRICH, Senior Circuit Judge.

This is an action brought by the President and Trustees of Colby College, hereinafter plaintiff, who are engaged, and have been since 1813, in conducting a four-year college in Waterville, Maine, from 1867 under the name of Colby University, and since 1899 under the name of Colby College. Plaintiff seeks to enjoin the use of the name Colby College-New Hampshire by defendant, an educational institution in New London, New Hampshire.[1] The district court denied a preliminary injunction, 359 F.Supp. 571, and thereafter dismissed the complaint. 374 F.Supp. 1141. (Citation to these opinions will hereafter be by page, only.) Plaintiff appeals.

Defendant, having for many years provided coeducational secondary schooling under several names, in 1878, in recognition of benefactions from a prominent New Hampshire family, changed its name to Colby Academy. In 1928 it dropped males from its enrollment and added two years of college instruction. In 1933 it discontinued secondary education and changed its name to Colby Junior College for Women. Commencing ten years later, it gradually extended its courses, and began awarding baccalaureate degrees in such subjects as Medical Technology, Theatre, Music, and Business Administration. This ultimately led to the conclusion to drop the Junior, and because males were again admitted, to drop the reference to women. In October 1972 defendant's board of trustees voted to change its name to Colby College-New Hampshire, effective July 1, 1973. This suit was instituted on May 3, 1973.

Defendant makes, and the district court accepted, two basic points: that no "exclusive" secondary meaning had attached to plaintiff's name, Colby College, and that defendant's name change did not increase, or threaten the likelihood of increasing, confusion that already existed between the two institutions. We hold that the decision on the first point embraced one, and possibly two, errors

---

1. The court stated that New Hampshire law was applicable, but that it found none (except with respect to n. 14, post) and would take its law from elsewhere. We accept its approach.

of law, and that as to both there were unwarranted conclusions of fact.

## I. Secondary Meaning.

■ While plaintiff's name is not, strictly, a descriptive phrase of general usage, neither can it be termed fanciful, coined, or arbitrary in the same sense as Xerox or Kodak. In such circumstance, plaintiff has properly assumed the burden of showing not only the likelihood of confusion between itself and defendant, but also that its name has acquired a secondary meaning associating plaintiff with its name in the minds of the consuming public. See Kellogg Co. v. National Biscuit Co., 1938, 305 U.S. 111, 116, 118, 59 S.Ct. 109, 83 L.Ed. 73. Our first question is whether in respect to this the court imposed too high a standard.

■ In order to find secondary meaning, the district court required proof that "the name 'Colby College' . . . exclusively signif[ies] the plaintiff institution in the mind of the public." (359 F.Supp. 575). See also (374 F.Supp. 1144). Careful reading of both opinions suggests the court may have felt that exclusivity was lost if, to some persons, the name meant the wrong party. This is not so; plaintiff need only prove a "primary significance." Kellogg Co., ante, 305 U.S. at 118, 59 S.Ct. 109. The "lack of exclusivity in the use of the word . . . [is merely] a factor militating against a finding of secondary meaning." American Heritage Life Ins. Co. v. Heritage Life Ins. Co., 5 Cir., 1974, 494 F.2d 3, 13. Carter-Wallace, Inc. v. Procter & Gamble Co., 9 Cir., 1970, 434 F.2d 794, 802 (accord). There is sufficient secondary meaning as long as a significant quantity of the consuming public understand a name as referring exclusively to the appropriate party, for it is undesirable that such a quantity be deceived even if some, relatively small, number is not.

See Food Fair Stores v. Food Fair, Inc., 1 Cir., 1949, 177 F.2d 177, 185;✦ G. & C. Merriam Co., v. Saalfield, 6 Cir., 1912, 198 F. 369, 373, aff'd and modified, 238 F. 1, cert. denied, 243 U.S. 651, 37 S.Ct. 478, 61 L.Ed. 947.

Even if the court correctly understood this limited meaning of exclusivity, it overstated the "militating" evidence. It found that defendant "has, at times, been referred to, both formally and informally, as Colby College." (374 F.Supp. 1144). Support for this finding is of a very unsatisfactory character.[2] It does not, in any event, rebut the controlling fact, if otherwise established, that a substantial number of persons regarded "Colby College" as referring exclusively to the plaintiff. As to this the evidence leaves but one answer.

■ Secondary meaning is established in a number of ways. First, from the admitted fact of long and exclusive use. See Norm Thompson Outfitters, Inc. v. General Motors Corp., 9 Cir., 1971, 448 F.2d 1293, 1296; G. & C. Merriam Co. v. Saalfield, ante, 198 F. at 373. The district court's observation that defendant has shared the name "Colby" with plaintiff since 1878, and was frequently referred to by some by that name alone, does not destroy this inference, since secondary meaning may attach to the conjunction "Colby College." Cf. Food Fair, ante, 177 F.2d at 185. There is no evidence that defendant has ever held itself out, either formally or informally, as "Colby College." Despite the mistaken impressions of a few, only plaintiff has made use of that name.

■ Second, as defendant concedes, the size or prominence of an enterprise may warrant the inference that its name has acquired secondary meaning. See Shaler Co. v. Rite-Way Products, 6 Cir., 1939, 107 F.2d 82, 84, cert. denied, 310 U.S. 634, 60 S.Ct. 1076, 84 L.Ed. 1403; Wisconsin Elec. Co. v. Dumore Co., 6

2. For this defendant presented, in two exhibits, 856 newspaper clippings written before its change of name. While 166 of these clips, or less than 20%, designated defendant as "Colby College," they did so only in headlines of stories which properly identified defendant in the body of the article. The remaining 80% referred to defendant throughout either as "Colby," or "Colby Junior."

Cir., 1929, 35 F.2d 555, 557–558, appeal dismissed, 282 U.S. 813, 51 S.Ct. 214, 75 L.Ed. 728. Without intending invidious comparison, we note that plaintiff outdistances defendant in size, reputation, and achievement.[3]

■ Third, while secondary meaning is shown by the success rather than by the mere fact of an enterprise's promotional efforts, cf. General Time Instr. Corp. v. United States Time Corp., 2 Cir., 1948, 165 F.2d 853, 854–855, cert. denied, 334 U.S. 846, 68 S.Ct. 1515, 92 L.Ed. 1770, the normal consequence of substantial publicity may be inferred. See Carter-Wallace, ante, 434 F.2d at 800; Beef/Eater Restaurants, Inc. v. James Burrough Ltd., 5 Cir., 1968, 398 F.2d 637, 639–640. Defendant does not dispute the evidence that plaintiff's numerous and varied publications, of appreciable distribution, its public service activities, and its membership in professional associations, as well as the activities and associations of its students and faculty, all serve to promote its name and good will.

■ Finally, in addition to the inference we believe these factors, cumulatively, compelled, plaintiff presented direct evidence that its name has acquired a secondary meaning. Dr. Armstrong, president of Middlebury College, Vermont, testified that the name "Colby College" is exclusively understood "in the academic field as meaning the plaintiff." The district court accepted his testimony.[4] (374 F.Supp. 1144). It then erred in concluding that reputation in the academic community fails to show secondary meaning " 'broadly known to the public.' " Id., citing 52 Am.Jur. Trademarks, Tradenames, and Trade Practices, 1944, § 73. Of course the concept of secondary meaning assumes public recognition, but this does not define what is the product's "public." Even the case cited by the court indicates that the concept of secondary meaning "contemplates that a word or phrase . . . might nevertheless have been used . . . so exclusively by one producer . . . that, in that trade and to that branch of the purchasing public, the word or phrase has come to mean that the article was his product . . .." Merriam, ante, 198 F. at 373 (Emphasis added). See Mortellito v. Nina of California, Inc., S.D.N.Y., 1972, 335 F.Supp. 1288, 1295 (secondary meaning of needlepoint manufacturer among needlepoint purchasers); Fund of Funds, Ltd. v. First American Fund of Funds, Inc., S.D.N.Y., 1967, 274 F.Supp. 517, 524 (secondary meaning of mutual fund among "members of the investing public or professional investment community."). We hold that a college may establish that its name has acquired secondary meaning sufficient to invoke protection against infringement by demonstrating the congruence of its name and its institution in the minds of an appreciable number of individuals broadly associated with other institutions of higher education in a given geographic area.

It could be argued that a strongly held opinion in academic circles suggests that

---

**3.** Plaintiff is a four-year liberal arts college with an endowment of $30 million and an annual budget of $8 million, now operating on a campus of 39 buildings constructed at a cost of $16 million. It has a distinguished faculty of 120 members, 82 with doctorates, and an enrollment of 1600 above average male and female students from a wide geographic area, but principally from the northeastern United States. Plaintiff has initiated or participated in a variety of innovative educational programs, and was characterized by the district court, on substantial evidence, as "undoubtedly one of the finest small coeducational liberal arts colleges in New England, if not the entire country." (374 F.Supp. 1147). Despite movement in plaintiff's direction, post, defendant remains primarily a two-year school, offering a variety of opportunities for vocational training as well as a traditional liberal arts education to over 500 female students of a different order from plaintiff's. (359 F.Supp. 575).

**4.** Defendant offered no contradiction. In spite of the court's acceptance of Dr. Armstrong's testimony, defendant seeks to discredit it on the singular ground that Middlebury is an institution similar to the plaintiff. This fact does not warrant a conclusion of bias. Rather, the witness's broad experience, leading to his occupying a similar position in academia, made his opinion particularly valuable.

a similar view is held by the public at large. Plaintiff did not rest upon such an inference, but offered empirical evidence in the form of a survey conducted by the Becker Research Corporation of Boston, Massachusetts, concluding that New England residents associate the name "Colby College" with plaintiff. Becker interviewed by telephone 1500 New England residents, 500 from Maine, 500 from New Hampshire, and 500 from metropolitan Boston, chosen as a representative cross-section of the population in these areas. Seventy-nine per cent of the Maine respondents, 40% of the Boston respondents, and 37% of the New Hampshire respondents identified "Colby College" as located in Maine, where plaintiff is located, while only 2%, 7%, and 18% respectively placed "Colby College" in New Hampshire, defendant's location. Moreover, 72%, 57%, and 45% identified "Colby College" as a four-year institution like plaintiff, while only 4%, 9%, and 15% identified "Colby College" as a two-year institution like defendant. And 81%, 53%, and 48% characterized "Colby College" as coeducational, as is plaintiff, while only 5%, 13%, and 19% believed that "Colby College" primarily educates students of only one sex, as does defendant. In sum, an average of well over 50% of all respondents identified "Colby College" as a four-year, coeducational institution, located in Maine, thus distinguishing plaintiff from defendant according to three major characteristics by which the two institutions may be distinguished.

The importance of qualified survey evidence in establishing secondary meaning is well recognized. *See, e. g.,* Holiday Inns, Inc. v. Holiday Out in America, 5 Cir., 1973, 481 F.2d 445, 447; Standard Oil Co. v. Standard Oil Co., 10 Cir., 1958, 252 F.2d 65, 75; Zippo Mfg. Co. v. Rogers Imports, Inc., S.D.N.Y., 1963, 216 F.Supp. 670, 682–686. Nor can it be doubted that the percentage of respondents associating plaintiff with its name is sufficiently "appreciable," *Food Fair,* ante, 177 F.2d at 185, or "significant," Carling Brewing Co. v. Philip Morris, Inc., N.D.Ga., 1967, 277 F.Supp. 326, 332, to indicate secondary meaning. *See Zippo,* ante, 216 F.Supp. at 687 (42.6%).

Becker was an experienced surveyor. The court, however, rejected his findings, not because defendant offered contrary evidence, but largely because of criticisms of the survey offered by defendant's expert, a business school professor who had done work in market research. The witness voiced two complaints, one of which was that he found one of the posed questions ambiguous.[5] The second was that the witness, who taught at Dartmouth, found it incredible that among the 500 respondents in the Boston area there were about as many who knew of Bowdoin and Colby Colleges as knew about Dartmouth (although they did not give them as high a reputation). Finally, the district court faulted the survey for failing to indicate "the confidence level of [its] validity . . . .," in light of its attempted extrapolation from 1500 respondents to at least two million New England residents.[6] (374 F.Supp. 1145). This, in effect, questioned the surveyor's basic expertise. While, of course, expert testimony need not be accepted, we find little reason for rejection.[7] In any event, the court's doubts do not remedy the

---

**5.** Accepting this criticism, the court felt that the survey's respondents might have been confused as to the true character of defendant's institution, and thus might have intended to identify defendant as "Colby College." We have difficulty in following the reasoning.

**6.** The survey reports:

"The chances are approximately 95 in 100 that, using the same survey procedures, the results in this study do not vary by more than [a maximum of 5] percentage points, plus or minus, from the result that would be obtained from a complete coverage of the sample universe."

**7.** Defendant's counsel seeks to come to the court's aid by saying that the Maine, Boston and New Hampshire target regions do not comprise a large enough area; that the survey excludes those "who have the good sense not to use the telephone," and that the interviewers were inexperienced; criticisms not voiced even by defendant's own witness.

lack of affirmative evidence to the contrary. We realize that if the court did not err, legally, in its conception of exclusivity, we are reversing a finding of fact. However, a secondary meaning can be established as a matter of law. *Beef/Eater Restaurants, Inc.*, ante. To find on this record, basically because occasional newspaper items referred to defendant as Colby College and some persons spoke of defendant simply as Colby, plaintiff had not established a secondary meaning in its seventy year name Colby College must be termed inescapably erroneous.

## II. *Increased Confusion.*

 Concededly because of sharing the name "Colby" for almost a century, some confusion between the two schools has existed throughout defendant's history. For reasons already expressed, the common use of this word does not mean that there is no secondary meaning in plaintiff's full name. However, we agree with defendant that plaintiff has the burden of showing that whatever confusion existed before defendant's change of name is likely to increase.[8] The court did not hold that confusion worse confounded was acceptable, but it found it not likely to occur. Although we fully recognize the double burden that is on the plaintiff as appellant, we hold this finding, too, to be plainly erroneous.

We begin with a facial comparison of the names at issue. Such assessment strongly suggests that defendant's new name, "Colby College-New Hampshire," presents a greater likelihood of confusion with plaintiff than its old name, "Colby Junior College for Women." The district

court, as justifying the contrary view, stated that "the addition of '-New Hampshire' is a reasonable effort to give the public fair warning about the possible confusion." (374 F.Supp. 1147). In this it was supported by defendant's expert.[9] In accepting this testimony the court ignored the argument suggested by the court in Miss Universe, Inc. v. Patricelli, 2 Cir., 1969, 408 F.2d 506, 510, that the geographical identification "need not have a qualifying meaning in the minds of consumers," but may imply either that plaintiff is located in New Hampshire or that plaintiff and defendant are somehow affiliated, two possibilities far less likely under defendant's old name. The court's emphasis of the protection afforded plaintiff by the suffix "-New Hampshire" might also seem inconsistent with its view, post, that defendant's name is likely to be bobtailed by omitting the word "College." More directly, it rejected the testimony of several experts that any distinguishing force that may result from the suffix will in fact be lost because it will be dropped, even if not officially, in both oral and written references. This testimony cannot be disregarded; it has already been borne out. Plaintiff cites several publications of importance in academic circles which identify defendant simply as "Colby College." [10] Thus we have the striking fact that, by curtailment, defendant is achieving not merely a similar name, but an identical one.

To this array the district court made a number of points which we can only regard as unsatisfactory argument. First, the court suggested that any future confusion will be caused by the joint use of the name "Colby": "I take judicial notice of the fact that colleges and univer-

---

8. Likelihood is enough. *See* Valmor Prods. Co. v. Standard Prods. Corp., 1 Cir., 1972, 464 F.2d 200, 202–203; Baker v. Simmons Co., 1 Cir., 1962, 307 F.2d 458, 463, vacated and remanded on other grounds, 325 F.2d 580, aff'd, 342 F.2d 991; LaTouraine Coffee Co. v. Lorraine Coffee Co., 2 Cir., 1946, 157 F.2d 115, 117, cert. denied, 329 U.S. 771, 67 S.Ct. 189, 91 L.Ed. 663.

9. "My opinion would be that, over the long run, because the name 'Colby College-New

Hampshire' is more specific with respect to location, that it would help clarify what has been, in my opinion, a confusing situation."

10. These include the School, College, and University Directory of the American Baptist Board of Educational Ministries, the Beta Book directory of colleges, a meeting roster of the College Entrance Examination Board, and two programs from high school "college night" gatherings.

sities are referred to by their first names and that dropping of the generic term 'College' and/or 'University' is well nigh universal." (374 F.Supp. at 1146). While we might question the universality of such practice (consider, e. g., Boston University and Boston College), to the extent that it exists it is a reason for condemning rather than accepting the change. On the evidence of record, when defendant's name was Colby Junior College for Women many who dropped the "College" spoke of defendant as "Colby Junior." With defendant's present name this ready distinction disappeared.

Secondly, the court pointed out that, at least in curricula, the parties are not seriously competing. This is never a complete answer. See Safeway Stores, Inc. v. Safeway Properties, Inc., 2 Cir., 1962, 307 F.2d 495, 497–498; Baker, ante, 307 F.2d at 462. Moreover, the evidence is undisputed that the defendant is moving, however slowly, in plaintiff's direction, by shifting curricular emphasis from technical training to liberal arts, by increasing somewhat the small number of bachelor degrees awarded, by seeking to attract students of higher academic achievement, and by opening its doors to males. Indeed, the court found that it was these changes and others which moved defendant "somewhat away from its image as a junior college for women only," and compelled its change of name. (374 F.Supp. 1147); (see 359 F.Supp. 575). We cannot avoid the conclusion that as competition increases the likelihood of confusion between the two schools must inevitably increase as well.[11] Even if we accept the district court's observation that the importance to individuals of their future placement or donation should lead them to investigate colleges carefully (359 F.Supp. 573); (374 F.Supp. 1174), the record evidence of actual confusion since

the name change, which we will not pause to detail, undermines the force of this prediction. Obviously an enterprise is entitled to any residue of careless patrons. See Tisch Hotels, Inc. v. Americana Inn, Inc., 7 Cir., 1965, 350 F.2d 609, 614; Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 2 Cir., 1960, 281 F.2d 755, 761.

Finally, the court suggested that any instances of confusion would be straightened out through the diligent efforts of both institutions. However, effort to correct a mistake is a cost of confusion, not an argument against its prevention. Nor need we pursue the question how far the party who may be thought to lose more by the mistake can count on the diligence of the other. We merely note that the very announcement defendant sent out of its name change contained a reference to itself as Colby College, without the suffix.

In sum, we find nothing to contradict, or to counteract, the unequivocal testimony of Dr. Armstrong and a number of others that defendant's name change is likely to increase the instances of confusion with plaintiff.

### III. Policy Considerations.

The court asserted that even if it erred in its conclusion that plaintiff had failed to show secondary meaning and likely confusion, policy considerations justified refusing relief. Like defendant's expert, the court appeared to be influenced by its finding that defendant's change of name evidenced no intention to trade upon plaintiff's reputation and good will, and constituted solely a good faith effort to accommodate its name to changes in curriculum and the composition of its student body. (359 F.Supp. 573); (374 F.Supp. 1145). This finding is not clearly erroneous, and we accept it.[12] However, the question of

---

11. "[I]n time, the alumni of the New Hampshire school may also resent the fact that they are being confused with that 'other' Colby." (359 F.Supp. 576).

12. At the same time, we observe that since defendant was changing its name, utmost

good faith might have dictated that, if appropriately possible, defendant select a name that affirmatively tended to reduce existing confusion rather than continue it. The court found that several alternative names utilizing the word "Colby" "would be as historically and descriptively accurate as Colby College-

good faith is only one element to be considered in assessing a claim of infringement. A finding of bad faith may give rise to a presumption that the adoption by one enterprise of a name similar to that of another is likely to cause confusion, *see Baker,* ante, 307 F.2d at 465, but a finding of good faith is no answer if likelihood of confusion is otherwise established.

The court relied additionally on the public policy of "keeping [useful words] in the public domain." (374 F.Supp. 1148). This policy is well recognized, and gives rise to the requirement, ante, that enterprises which utilize names of general or descriptive usage must demonstrate secondary meaning in order to sustain a claim of infringement. But to utilize it to deny relief despite a showing of secondary meaning is to deny tradename protection to all words of descriptive quality, a judicial option long foreclosed under common law precepts. *See Kellogg,* ante, 305 U.S. at 116, 118, 59 S.Ct. 109. In addition, we think this case a weak one for assertion of the policy even in its proper sphere. The policy is recognized because words "in our general vocabulary which all can use to describe products or services should not be unduly limited." *Safeway,* ante, 307 F.2d at 498. *See* Esquire, Inc. v. Esquire Slipper Mfg. Co., 1 Cir., 1957, 243 F.2d 540, 543. While "Colby College" is not a coined or fictitious appellation, neither is it an intrinsic part of "our general vocabulary."

Finally, there is a more important principle, the countervailing policy of preserving individual identities, which must be particularly important in the case of educational institutions serving the public. This is not to be denigrated, as the court at one point appeared to do, by describing plaintiff's interest, in view of the nature of its enterprise, as "somewhat esoteric" and perhaps based upon "hurt pride." (374 F.Supp. 1147). The

court was speaking more to the point when it echoed the almost unanimous expert testimony that "[a] college's identity and image are critical to its survival and growth." (374 F.Supp. 1148).

The court articulated this principle with respect to the defendant, but not to the plaintiff. We are not to be understood, in turn, as denigrating the court's repeatedly evidenced concern for defendant's identity and image and the significant extent to which its tradition and character are bound up with the name "Colby." (374 F.Supp. 1148). Nothing in this opinion should be construed to preclude the continued use by defendant of that word in some manner.[13] We must hold, however, that defendant's present name is an intrusion on the interest of the plaintiff in its own identity and good will, and the interest of the public in preserving the integrity of individual accomplishment and reputation.[14]

The judgment of the district court is vacated, and the action remanded for entry of the injunction sought in the complaint.

---

New Hampshire, and also would serve to more clearly distinguish the two schools." (374 F.Supp. 1147):

13. *See* n. 12, ante.

14. Because we have accepted plaintiff's claim of tradename infringement, we need not reach the question whether relief is also warranted under the New Hampshire anti-dilution statute, N.H.R.S.A. § 350–A:12.