323 F.Supp.2d 983 (2004)
The STEAK N SHAKE COMPANY, et al., Plaintiffs,
v.
The BURGER KING CORPORATION, et al., Defendants.
No. 4:04CV525CDP.
United States District Court, E.D. Missouri, Eastern Division.
July 7, 2004.
*984 *985 Ethan Horwitz, Georgia Yanchar, Ira Jay Levy, Goodwin Procter LLP, New York, NY, R. David Hosp, Goodwin Procter LLP, Boston, MA, Lawrence E. Evans, Jr., Richard H. Kuhlman, Blackwell, Sanders, Peper, Martin, LLP, St. Louis, MO, for Plaintiffs.
John E. Villafranco, Thomas E. Gilbertsen, William M. Bailey, Collier and Shannon, Washington, DC, Dutro E. Campbell, II, Gregory E. Upchurch, Husch and Eppenberger, LLC, St. Louis, MO, Harvey M. Tettlebaum, Husch and Eppenberger, LLC, Jefferson City, MO, for Defendants.

MEMORANDUM AND ORDER
PERRY, District Judge.
Steak n Shake[1] seeks a preliminary injunction against defendant Burger King to prevent Burger King from using the term "steakburger." Steak n Shake asserts that it has a common-law trademark in the term. Burger King has recently introduced a new burger it calls "The Angus Steak Burger" and has sought a federal trademark on "The Great American Steakburger," both of which Steak n Shake alleges infringe on its rights in the term "steakburger." After hearing the parties' evidence and considering their arguments, I will deny the motion for preliminary injunction.
Steak n Shake failed to meet its burden of showing that it is likely to succeed on the merits of any of its claims or that it will suffer irreparable harm if an injunction is not granted. The evidence at this stage shows that the term "steakburger" should be classified as generic under trademark jurisprudence. Alternatively, even if the term is descriptive, rather than generic, Steak n Shake has not shown that it is likely to succeed on the merits of proving that the term has acquired secondary meaning to consumers. I will therefore deny Steak n Shake's motion for a preliminary injunction. Additionally, I will deny Burger King's motion to dismiss, and I will refer this case immediately to Alternative Dispute Resolution in hopes that the parties can reach a mutually-agreeable settlement and return to selling burgers.

Findings of Fact
The first Steak n Shake restaurant opened in 1934 in Normal, Illinois. Within a few years several more restaurants were opened, first in Illinois, then expanding to Indiana and Missouri. There are currently over 400 Steak n Shake restaurants in 18 states. Most are company owned, but some are franchises. Steak n Shake has its greatest number of stores in the Midwest and Southeast United States. Two of Steak n Shake's largest markets are in Missouri, where there are currently 55 Steak n Shake restaurants (15 of them are located in St. Louis), and in Florida, where there are 72 restaurants.
*986 Today Steak n Shake restaurants follow the same concept as they did when they were first opened. All Steak n Shake restaurants offer sit-down service, a full wait staff, and made-to-order meals served on real china. Steak n Shake specializes in burgers and hand-dipped milkshakes, but it offers a variety of other menu items such as chili and salads. In addition to sit-down dining, most Steak n Shake restaurants offer drive-thru and take-out service and are open twenty-four hours a day.
Gary Reinwald, Steak n Shake's Executive Vice-President of Operations, testified about the unique process of making a Steak n Shake steakburger. Reinwald, a forty-year Steak n Shake veteran, testified that the steakburger is cooked on a dry, high-temperature grill. The "puck" of meat is placed on the grill with a fork and is then lightly mashed with a spatula and seared. The meat is then flipped and mashed on the other side until it is flat on the top of the grill. The dry, hot grill quickly cooks the juices up through the meat of the steakburger. After cooking for fifty seconds, the steakburger is cut off of the grill with a razor sharp spatula, flipped, and then cooked for another twenty seconds. Because of this process, the Steak n Shake steakburgers are always an irregular shape, approximately a quarter of an inch thick, and the meat is carmelized and crispy at the edges. Once the Steak n Shake steakburger is cooked, it is placed on a toasted bun and "dressed" to the customer's specifications. Steak n Shake sells its steakburgers as a single, double, or triple; according to Reinwald, most customers order a double steakburger.
Over the past seven decades, Steak n Shake has invested millions of dollars and substantial amounts of time and effort in developing, establishing, and promoting its steakburgers. Steak n Shake commercials, while sometimes discussing steakburgers explicitly, often fade with a focus on the Steak n Shake logo and the sound of a sizzling steakburger in the background. In 2003, Steak n Shake's total marketing expenditure was approximately $19 million. In the six previous years, Steak n Shake's total marketing expenditure ranged between approximately $7 million and $16 million. Steak n Shake spent approximately $2.7 million advertising and promoting its goods and services in the St. Louis Designated Marketing Area[2] in 2003, which was consistent with previous years. It spent similar amounts in Florida.
At least as early as the 1950's, Steak n Shake began using the term "steakburger" as the name for its burgers, featuring this term prominently in its advertising campaigns. It has no federal or state registrations in the term "steakburger" by itself. However, Steak n Shake has registered several marks with the United States Patent and Trademark Office that include the term:
(a) "Original Steakburgers," for sandwiches of ground beef, Reg. No. 2,435,279;
(b) "Famous for Steakburgers," for restaurant services, Reg. No. 1,272,197;
(c) "Famous for Steakburgers," for beverage glassware, coffee cups, plates, and cups, Reg. No. 2,370,185;
(d) a logo that includes the phrase "Famous for Steakburgers," for use in restaurant services, Reg. No. 2,233,542;

*987 (e) a logo that includes the phrase "Famous for Steakburgers," for certain clothing items, Reg. No. 2,302,158;
(f) a logo that includes the phrase "Famous for Steakburgers," for restaurant services Reg. No. 1,012,475; and
(g) "The Original Steakburger," for restaurant services, Reg. No. 2,586,843.
The current logo used on all Steak n Shake materials and menus uses the phrase "Famous for Steakburgers." This phrase, and the use of the term "Steakburger" as the name of the menu item and as a distinctive offering of Steak n Shake has been used at least since the 1960s.
Although there is no evidence that Steak n Shake ever sought national registration of the term "steakburger" by itself, it sought at least one state registration of this mark. In 1938 Steak n Shake founder Gus Belt sought to have "steakburger," along with other terms such as "cheeseburger," trademarked with the State of Illinois. The registration was initially rejected because in 1935 another person had registered the trademark "Steak-Burger" to be "used in connection with making sandwiches of ground meat consisting purely of steak meat." In response, Steak n Shake founder Gus Belt asserted that he had conducted an investigation but did not find any evidence of ongoing use by the prior registrant.
Although Steak n Shake alleges in its complaint that it has used the term steakburger as a trademark continuously since 1934, the evidence does not support this claim. Early menus show steakburger listed as the type of meat from which Steak n Shake's burgers were made. Other advertisements from the 1930s and 1940s showed that many stores and restaurants other than Steak n Shake used the term "steakburger" to describe a type of meat, specifically, a higher quality ground beef, made from steak or mostly steak cuts of the beef. An early photo of the original Steak n Shake restaurant in Normal, Illinois showed the store sign saying "Steak Hamburgers," although later this photo was changed to show the sign saying "Steakburgers." The altered photo of the original store has been used in Steak n Shake's materials for many years.
The history of the use of the term "steakburger" was discussed by Burger King's expert witness Dr. Ronald Butters, a Professor of English and Cultural Anthropology at Duke University. Dr. Butters' specialty is English Linguistics with an emphasis on American English, American social and regional dialects, and the changes in American English in the 20th Century with particular reference to lexicography, which is the science of making dictionaries. He testified that he found references to "steakburger" dating back to the 1920s. Dr. Butters discussed the origin of the word "hamburger" and the history of "burger" words such as "chickenburger" and "veggieburger."
In tracing the etymology of steakburger (or steak-burger or steak burger), Dr. Butters found the term to be an offspring of the original term "hamburger," which itself is a shortened form of "Hamburger steak," which was ground beef formed into a patty, fried and served like a steak. It was called a Hamburger steak because it was originally produced in Hamburg, Germany. By the beginning of the twentieth century, restaurant owners began making sandwiches by placing "hamburger steaks" between two slices of bread, and butchers began selling ground beef as "hamburger meat." By the 1920's, the term for both the sandwich and the ground meat was shortened to "hamburger."
Dr. Butters testified that in the years preceding World War II the term burger began increasingly to be used either by itself to denote sandwiches made from cooked ground meat, especially beef, and *988 as the second part of compound words that denoted other things about the burger, such as its origin (a Wimpy burger in Popeye cartoons), additional ingredients (cheeseburger), or the type of ground meat or meat substitute used (beef burger, nut burger, steakburger).
Burger King's evidence showed that numerous other restaurants in Missouri, Florida, and across the nation have used the term "steakburger" from time to time. Most of these restaurants have been single stores such as the Burger House in California, Missouri, which has been listing Steakburgers on its menu since 1998. Michael Robertson, owner of the Burger House, testified that he has seen steakburgers sold at the following restaurants: Eddie's in Sedalia, Missouri; Goody's Steakburgers in Columbia, Missouri; Winstead's in Kansas City, Missouri; and at Arrowhead Stadium in Kansas City when he was attending a Kansas City Chiefs Football game.
Burger King submitted several additional instances[3] of third party use of the term "steakburger," in addition to several instances of use of the term "steakburger" in connection with federal trademarks. For instance, the Winstead's chain of restaurants in the Kansas City area lists a steakburger on its menu. Winstead's owns federal registration rights to "Winstead's: Steakburgers Since 1940." In the trademark application for its logo, Hickory Farms includes "steak-burger meat" as part of the description of goods and services it sells in conjunction with the mark. In another application file, Meadowlane Farms, Inc, an Ohio corporation, registered "Texas Longhorn Tender Lean Beef." Meadowlane Farms sought to identify its goods as a "beef product," however the trademark examiner found the description "unacceptable as indefinite." Meadowlane Farms responded by amending its product description to include " beef product, namely, beef steak, steak burger and beef roast ."
One of the more well-known registrations uses the term "steakburger" in a decidedly generic fashion. Kraft Foods Holdings, Inc., maker of A.1. brand steak sauce, owns a registration for the mark "A.1. Makes Hamburger Taste Like Steakburger." The mark was registered over twenty years ago and was featured prominently in national advertising of the product. Other federal steakburger registrations either disclaim the term or use it in a generic sense as part of its product description. For example, the registration for "The Great Steakhouse Steak Burgers" disclaims the exclusive right to use "steak burgers," and the registrations for "Rite Ranch," "Winstead's," "Tiny Tot Treat," "Gourmet Marketplace," and "Emborg E" include steakburgers in a description of the articles of goods to which those marks apply.
Consumers have been exposed to the term "steakburger" in a variety of different retail contexts as well, such as Wal-Mart's sale of a "steakburger party pack." Interestingly, the Internet domain name www.steakburger.com was once owned by Steak n Shake, but its registration lapsed and the domain name was purchased by Johnson Ranch in Milford, Texas. Johnson Ranch now offers for sale across the nation its brand of grass-fed SteakBurger beef.
*989 Steak n Shake has recently attempted to enforce its claimed mark in the steakburger name. It is currently in settlement negotiations with a restaurant in Indianapolis called "96th Street Steakburgers." Steak n Shake notified Burger King of its contentions as soon as it heard that Burger King had sought to register "The Great American Steakburger" as a mark. Steak n Shake has never taken action against Winsteads, A-1, Wal-Mart, or Johnson Ranch, the owner of www.steakburger.com. Nor has Steak n Shake taken action against the numerous small restaurants that have used the term because it did not consider them to be competitive threats.
Defendant Burger King Corporation owns and/or franchises a national chain of fast-food restaurants. Of the approximately 7700 Burger King restaurants in the U.S., approximately 7100 are licensed franchise operations, while 600 are directly owned by Burger King Corp. Defendant Burger King Brands, Inc., is a wholly-owned subsidiary of Burger King Corp. that provides marketing services to Burger King Corp., and also owns and manages the trademarks utilized by Burger King Corp. and its licensed franchisees.
Burger King began plans to market a premium beef line of products, which included a premium hamburger, a steak sandwich, and a steak salad, in 2003. During the summer and fall of 2003, Burger King conducted consumer research to determine what attributes would be most appealing to customers for a premium burger at Burger King restaurants, and to decide which of the various "builds" of premium burgers consumers would prefer. Burger King also tested various names for the different burgers under development. Many of the names that Burger King tested or considered included a description of the product as a "steakburger" or "steak burger." Burger King tested and positioned its premium burgers against other premium burgers being offered by other fast-food restaurants like Hardee's and Carl's Jr., competitors who had seen success with premium burger lines. Eventually, Burger King settled upon the name "The Angus Steak Burger," and the product was fully launched to all Burger Kings nationwide by the Memorial Day weekend of 2004. The Angus is a very thick burger, made from 100% Angus grainfed beef, and served with grilled onions, lettuce, and steak sauce.
Steak n Shake presented survey evidence regarding its alleged mark. Before bringing this lawsuit, Steak n Shake commissioned Jacob Jacoby, Ph.D., an expert in consumer recognition surveys, to evaluate and quantify the level of consumer recognition of the term "steakburger." In conducting his research, Dr. Jacoby and his agents interviewed 240 individuals in Dayton, Ohio and St. Louis, Missouri, whose phone numbers were randomly selected. The individuals were read a list of items and asked whether they most often identified certain listed items as something that comes from more than one company or something that comes from only one company. The items included: Whopper; toast; ravioli; McNuggets; Grand Slam; Caesar salad; Steakburger; Cinni-minis; and Danish. If the individual identified a product as being most often associated with only one company, they were then asked what that company was.
In total, 56% of those interviewed identified "steakburger" as being most often associated with only one company and then identified that company as Steak n Shake. The results in St. Louis were more pronounced. There, 73% of consumers identified "steakburger" as most often being associated with one company, and then identified that company as Steak n Shake.
*990 Shortly after filing its Complaint, Steak n Shake commissioned Walter McCullough, Ph.D., also an expert in consumer recognition surveys, to evaluate and quantify the level of consumer recognition of the term "steakburger" in Florida, replicating Dr. Jacoby's survey in Tampa and Orlando. In total, 51% of those interviewed in Dr. McCullough's survey identified steakburger as being associated most often with one company, and they identified that company as Steak n Shake. The results in Tampa alone were even stronger. There, 59% of consumers identified steakburger as being most often associated with only one company and then identified that company as Steak n Shake.
Burger King presented an expert witness, Dr. Donald Mazis, who had several criticisms of the Jacoby and McCullough studies. He disagreed with the studies' sample size, the universe from which the sample was drawn, the lack of a control group to eliminate guessing, and the "priming" apparent in the study (Dr. Mazis thought the respondents would be in essence "trained" to answer with famous restaurants).
Further, Dr. Mazis criticized the studies' inquiry into whether respondents "most often" associated terms as coming from one or more than one company. He drew an example from the restaurant Chili's baby back ribs:
It would have been relatively easy to ask a question, something like, "Are steakburgers sold at one restaurant or more than one restaurant, or don't you know?" This most often just  the example that I used in the written, my written report is Chili's. Chili's advertises extensively this product called Baby Back Ribs, and a lot of people know that it's their signature product, and so a lot of people  and it's obviously Baby Back Ribs is a generic term, but if you ask people which way you would most often use the words Baby Back Ribs, a lot of people might say, "Oh, yeah, it's one company, it's Chili's." Chili's is the restaurant that they most often associate with Baby Back Ribs. Now if you ask them are Baby Back Ribs sold at one restaurant, only one restaurant or more than one restaurant, people may say, "Chili's sells them, but obviously you can get them other places. Most often I think of it as Chili's, but it's not the only restaurant you can get Baby Back Ribs," so this wording is very stilted, very leading, designed to get a particular result.
Tr. Vol. II, 28:19  29:13. Dr. Mazis opined that the methodology used by Jacoby and McCullough might be appropriate for a study of brand familiarity, rather than any secondary meaning of the term "steakburger."

Conclusions of Law
Steak n Shake seeks a preliminary injunction enjoining Burger King on a national basis from using the term steakburger, based on its Lanham Act claims. In the alternative, Steak n Shake seeks a preliminary injunction limited to the St. Louis and Florida markets, based on its claims under Missouri and Florida law.
The decision whether to grant a motion for a preliminary injunction requires that I balance four factors: (1) the likelihood of Steak n Shake's success on the merits; (2) the threat of irreparable harm to Steak n Shake in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest. Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir.1981). A preliminary injunction is an extraordinary remedy, see Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc., 815 F.2d 500, 503 (8th Cir.1987), and the burden of establishing *991 the propriety of an injunction is on the movant. Goff v. Harper, 60 F.3d 518, 520 (8th Cir.1995).

Claim Elements
To succeed on its trademark infringement and false designation of origin claims (Counts I and II), Steak n Shake must prove ownership of a valid trademark and a likelihood that defendants' allegedly infringing mark would be confused with the valid mark. Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc., 758 F.Supp. 512, 521 (E.D.Mo.1991) (plaintiff must establish the "two essential elements" of ownership of a distinctive mark, and defendant's use of a similar mark is likely to cause confusion as to the source of the products sold), aff'd 989 F.2d 985 (8th Cir.1993).
Steak n Shake has also brought Missouri and Florida claims of unfair competition and trademark infringement. See Claims IV & V (Missouri common law claims) and VII-X (Florida common law and statutory claims). The elements of these claims substantially overlap with the federal trademark and false designation of origin claims. Emerson Elec. Co. v. Emerson Quiet Kool Corp., 577 F.Supp. 668, 676 (E.D.Mo.1983) (common law infringement and unfair competition claims require two essential elements: 1) ownership of a distinctive mark or name; and 2) defendant's use of a similar mark or name that is likely to cause confusion as to the source of products sold by defendant); Tally-Ho, Inc. v. Coast Community College Dist., 889 F.2d 1018, 1025-26 (11th Cir.1990) (setting forth the elements for common law infringement in Florida and noting in footnote 14 that "an unfair competition claim based only upon alleged trademark infringement is practically identical to an infringement claim").
Finally, Steak n Shake has brought claims of trademark dilution under Missouri and Florida law. See Claims III and VII. Missouri's anti-dilution statute, Mo.Rev.Stat. § 417.061, provides:
Likelihood of injury to business reputation or of dilution of the distinctive quality of a [registered] mark ... or a mark valid at common law ... shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.
Florida's anti-dilution statute is quite similar, stating in relevant part:
Every person ... adopting and using a mark ... may proceed by suit ... to enjoin subsequent use by another of the same or any similar mark ... if it appears to the court that there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark ... of the prior user, notwithstanding the absence of competition between the parties or of confusion as to the source of the goods or services.
Fla. Stat. Ann. § 495.151.
To prevail on their dilution claim under either statute, plaintiffs must show: (1) the alleged trademark is valid at common law; (2) that the alleged mark is particularly strong; and (3) that defendant's use of the challenged term creates a likelihood of dilution of the distinctive quality of plaintiff's mark. Gilbert/Robinson, 758 F.Supp. at 527; E.R. Squibb & Sons, Inc. v. Princeton Pharmaceutical, Inc., 1990 WL 272707 at *10 (S.D.Fla. Sept.4, 1990) ("The elements of a violation of Florida's Anti-Dilution Statute ... are (1) the adoption and use of a trademark, (2) subsequent use by another of a similar mark, (3) causing a `likelihood of injury to business reputation or of dilution of the distinctive quality of the mark ... notwithstanding the absence of competition between *992 the parties or of confusion as to the source of goods or services.'").
Although Steak n Shake need not establish likelihood of confusion as an element of dilution, the dilution claims obligate it to prove that steakburger is not only a valid and existing trademark, but a strong or famous mark that is subject to dilution. Viacom, Inc.v. Ingram Enterprises, Inc., 141 F.3d 886 (8th Cir.1998) (applying Missouri law). Absent this requirement, "an anti-dilution statute `becomes a rogue law that turns every trademark, no matter how weak, into an anti-competitive weapon.'" Id. at 891 (quoting 3 McCarthy, Trademarks & Unfair Competition at § 24:108).

Analysis
Steak n Shake's claims depend on the existence of a valid, protectable mark. Four classes of terms have been created to aid in the analysis of trademarks: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. WSM Inc. v. Hilton, 724 F.2d 1320, 1325 (8th Cir.1984). These concepts blur at their edges, but in this case the parties agree that "steakburger" is either descriptive (as Steak n Shake claims) or generic (as Burger King contends). If Steak n Shake is right and "steakburger" is descriptive, then it must additionally show that the term has acquired secondary meaning.
A generic term, the weakest class of marks, refers to "a particular genus or class of which an individual article or service is but a member," and "suggests the basic nature of articles or services." WSM, 724 F.2d at 1325 (citing Soweco, Inc. v. Shell Oil Co., 617 F.2d 1178, 1183 (5th Cir.1980)). Because generic terms are "in the public domain and available for all to use," Cellular Sales, Inc. v. Mackay, 942 F.2d 483, 486 (8th Cir.1991), they "are precluded from trademark protection under any circumstances." Clipper Cruise Line, Inc. v. Star Clippers, Inc., 952 F.2d 1046, 1047 (8th Cir.1992). Generic terms are ones commonly used as the name of a kind of goods. Liquid Controls Corp. v. Liquid Control Corp., 802 F.2d 934, 936 (7th Cir.1986). Since "steakburger" has not been successfully registered as a trademark, Steak n Shake bears the burden of proving that it is not a generic term. See Anheuser-Busch, Inc. v. Stroh Brewery Co., 750 F.2d 631, 638 (8th Cir.1984).
Evidence of the public's understanding of a term may be obtained from any competent source, including dictionaries, newspapers, consumer surveys, advertisements, and other publications. Best Buy Warehouse v. Best Buy Co., 751 F.Supp. 824, 826 (W.D.Mo.1989), aff'd, 920 F.2d 536 (8th Cir.1990). "Whether a term is generic is determined by actual common usage." WSM, 724 F.2d at 1327 (citing Miller Brewing Co. v. G. Heileman Brewing Co., 561 F.2d 75, 79-80 (7th Cir.1977)). A dictionary definition of a word is an appropriate and a relevant indication of the ordinary significance in meaning of words to the public. Id.
Descriptive terms describe a characteristic or ingredient of the article to which they refer. A.J. Canfield Co. v. Honickman, 808 F.2d 291, 296 (3rd Cir.1986). Trademark protection may be extended to descriptive marks only if the marked terms have become distinctive by acquiring secondary meaning. Duluth News-Tribune v. Mesabi Publishing Co., 84 F.3d 1093, 1096 (8th Cir.1996). Secondary meaning exists when a mark is associated by consumers with a particular producer or distributor, rather than with the product itself. Cellular Sales, 942 F.2d at 486. Further, evidence of third party usage of similar marks on similar goods is "relevant to show that the mark is relatively weak and entitled to a narrower scope of protection." General Mills, Inc. v. Kellogg *993 Co., 824 F.2d 622, 627 (8th Cir.1987). Determining that a mark is weak means that consumer confusion has been found unlikely because the mark's components are so widely used that the public can easily distinguish slight differences in the mark, even if the goods are related. Id. at 626.
Steak n Shake is unlikely to prevail on the merits of its claims because the term "steakburger" is generic. Dr. Butters' testimony and the evidence presented with it directly refutes Steak n Shake's puzzling contention that "steakburger" is not a word in the English language. See Steak n Shake's Proposed Findings 56. Although his testimony is not determinative on the issue of whether the term merits trademark protection, since he was speaking as a historian and linguist  not as a trademark expert  his testimony provides helpful guidance as to how people use the term "steakburger" and the roots of this generic term.
For instance, Dr. Butters pointed to the earliest dictionary appearance of "steakburger" in Webster's New Twentieth Century Dictionary of the English Language, Unabridged (1961), which defines "-burger" as "[from hamburger] a combining form meaning sandwich of ground meat (and), as in steakburger, cheeseburger, etc. [Slang.]." Dr. Butters referenced several other similar dictionary appearances of steakburger as a "burger word" that refers to a kind of sandwich rather than a brand of sandwich.
One of Steak n Shake's own advertisements demonstrates that Steak n Shake itself has used the term generically to mean a burger made of ground steak: "Why do we call them Steakburgers? Because we can. We start with 100% pure U.S. beef, including the steak cuts: T-bone, strip steak and sirloin." At its simplest, "steakburger" is a burger made with ground steak meat. The name "steakburger" suggests the basic nature of the product itself. It is used this way by several other restaurants and by other burger sellers, such as Wal-Mart and Johnson Ranch, owner of www.steakburger.com.
I do not agree with Steak n Shake's argument that the Jacoby and McCullough surveys show the non-genericness of the term "steakburger." McCarthy, while noting that conducting consumer surveys has become almost "de rigueur" in litigation over the genericness of a disputed term, cautions that such surveys "must be directed at the issue of consumer perception as to the significance and meaning of the designation in issue. A survey that merely tests for consumer awareness of the designation is irrelevant." 2 McCarthy § 12:14. Although the Jacoby survey is slightly probative of the secondary meaning attached to the term "steakburger," I do not believe that the survey is relevant as to whether the term is generic. At most, the Jacoby study is directed at consumer awareness of the term and consumer familiarity with Steak n Shake, which advertises heavily that it is "Famous for Steakburgers."
If the claimed mark is a generic term, "no amount of evidence of purported secondary meaning can give legal protection to that generic name." 2 McCarthy § 15:24. Indeed, the "only kind of evidence of consumer reaction that will be relevant to the issue of alleged genericness is evidence that a majority of buyers recognize the term as a trademark, not as the name of the product." Id. (emphasis in original). Here, the Jacoby survey did not advance this understanding. Instead, Dr. Jacoby asked whether respondents "most often" associated the term with one company or more than one company. "Steakburger" was highly associated with Steak n Shake in the markets tested, but this fails to advance an understanding of the public perception of what a steakburger is. *994 Whether a steakburger, in the mind of the public, is simply a burger made from ground steak or whether it is the Steak n Shake burger, made from the special grilling process and served made-to-order on a toasted bun, is unclear from the Jacoby study.
This case is similar to Eastern Air Lines, Inc. v. New York Air Lines, Inc., 559 F.Supp. 1270 (S.D.N.Y.1983), in which Eastern Air Lines disputed its rival's use of the term "air-shuttle." The court, after hearing testimony from a lexicographical expert about the meaning of the words "air" and "shuttle," held that "[p]lacing a common generic adjective in front of a generic word does not make the word any the less generic, especially when the combination of the terms has both the purpose and effect of describing the genus of which the particular product is a species." Id. at 1276. Likewise, combining the two generic terms "steak" and "burger," into a compound form describes the genus of which Steak n Shake's steakburger is but a species.
Even assuming that "steakburger" is descriptive, Steak n Shake has failed to establish that the term has secondary meaning. Steak n Shake has thus has failed to demonstrate that it is likely to succeed on the merits of its claims. Under Eighth Circuit law secondary meaning is established only where a mark, by long and exclusive use and advertising in the sale of the user's goods, has become so associated in the public mind with such goods that it serves to identify them and distinguish them from the goods of others. Co-Rect Prods., Inc. v. Marvy! Advertising Photography, Inc., 780 F.2d 1324, 1330 (8th Cir.1985). Exclusive use of a claimed trademark is an essential element of a claim of secondary meaning, and Steak n Shake cannot prove such use, as demonstrated by the evidence of numerous third party users.
Although I believe the Jacoby study is slightly probative of the issue of secondary meaning because it tends to show an association in the mind of the public between Steak n Shake and "steakburgers," it is not worth the great weight that Steak n Shake argues it carries. Specifically, asking respondents whether they "most often" identify "steakburger" as coming from only one company as opposed to coming from multiple companies is indeterminate and awkward, as pointed out by Dr. Mazis with his analogy to Chili's baby back ribs.
I am aware that there is no such thing as a "perfect survey." 5 McCarthy § 32:178: "any survey is of necessity an imperfect mirror of actual customer behavior under real life conditions." Thus, "[i]t is notoriously easy for one survey expert to appear to tear apart the methodology of a survey taken by another." Id. § 32:178 (citing, inter alia, President & Trustees of Colby College v. Colby College-New Hampshire, 508 F.2d 804 (1st Cir.1975)). I will give "substantial weight" to a properly conducted survey. Anheuser-Busch v. Stroh, 750 F.2d at 639. However, Dr. Mazis' criticisms of the Jacoby study are valid, at least in part, and I do not believe Dr. Jacoby's survey is highly relevant to either genericness or secondary meaning. The evidence presented does not show that Steak n Shake is likely to prevail on the merits even if "steakburger" is descriptive, because secondary meaning is absent.
Even if a valid trademark had been established, Steak n Shake still has failed to establish the second required element of a trademark infringement suit  a likelihood of confusion among consumers of the products. In analyzing this question, I must examine the following factors: (1) the strength of the trademark, (2) the similarity between the parties' marks, (3) the competitive proximity of the parties' products, (4) the alleged infringer's intent *995 to confuse, (5) evidence of actual confusion, and (6) the degree of care reasonably expected of potential consumers. See Hubbard Feeds v. Animal Feed Supplement, 182 F.3d 598, 602 (8th Cir.1999). The ultimate inquiry is whether consumers will likely be confused as to the source of the allegedly infringing product. Id.
Steak n Shake argues two theories of infringement: that people might think Burger King's burgers are connected in some way to Steak n Shake (source confusion), or that they would be subliminally confused by another restaurant's offering a steakburger. These theories are weak, given the differences in the products, the branding on the wrappers, the many differences between "The Angus Steak Burger" and Steak n Shake's "Steakburger," and the location of the purchase of the burger. Though both restaurants sell co-branded products like Heinz ketchup and Hershey's Chocolate Pie, no facts support the notion that a customer walking into Burger King will be thinking that the burger she is about to eat is actually a Steak n Shake steakburger. There is little to no evidence supporting the element of likelihood of confusion. Similarly, there is little to no evidence showing any likelihood of dilution of Steak n Shake's reputation or of the distinctive quality of its restaurants and products.
As to the potential for irreparable harm, trademark infringement "by its very nature" results in irreparable harm to the owner of the mark and will be presumed, unless the trademark is already weak. Amoco Oil Co. v. Rainbow Snow, Inc., 809 F.2d 656, 663 (10th Cir.1987). Here, because Steak n Shake failed to demonstrate that its mark was not generic, and that consumers were likely to be confused by Burger King's Angus steak burger, I find that irreparable harm to Steak n Shake cannot be presumed.
Even though Steak n Shake has shown it may suffer some harm, it has not shown that the harm is irreparable. As I discussed above, that there is little danger that anyone will confuse (subliminally or otherwise) Steak n Shake steakburgers with "The Angus Steak Burger" when they are buying their respective sandwiches. Steak n Shake can still advertise as it does now, tailoring its advertising to meet the new challenges presented by Burger King's product. However, if Steak n Shake is ultimately able to prove its claims at trial, it can then prove up money damages, which should be sufficient compensation.
As to the third Dataphase factor, I believe Burger King overstated the potential harm that would result to it were I to grant an injunction. Burger King assumed that the entire product line would be a wasted effort if it was barred from using its chosen name. This contention is overblown. Burger King would not have to change all of its promotions, but it would have to change some of its labels, advertisements, and many of the point-of-purchase items. Despite this exaggeration, Burger King would suffer harm and incur expenses were the injunction to be granted, and I conclude that the balance of harms weighs in favor of denying the injunction.
The final Dataphase factor, the public interest in this case, does not strongly favor either party. On one hand, the public interest values free competition. On the other hand, society recognizes that competition among businesses must also be fair, and valid marks should be protected. Since Steak n Shake has not shown it is likely to prevail on its claim on the mark, then the public interest in encouraging vigorous competition favors denying the injunction.
*996 In conclusion, Steak n Shake has failed to meet its burden to show that a preliminary injunction should be granted, on either its federal or its state-law claims. I will deny the motion for preliminary injunction.

Burger King's Motion to Dismiss
Also before me is Burger King's motion to dismiss, which I will deny as moot because Steak n Shake recently amended its complaint. Even if the motion were not moot, I would deny it anyway because it encompasses matters outside the pleadings. I do not believe that there are no facts that Steak n Shake could prove to establish its claims. Burger King's arguments would be more appropriately addressed in a motion for summary judgment after both sides have had an opportunity to take further discovery.

Scheduling and ADR Referral
As is my common practice when ruling on preliminary injunction motions, I will immediately refer this case to Alternative Dispute Resolution. The parties have spent a great deal of time and money on the preliminary injunction phase of the case. From the discovery undertaken thus far and the arguments made, both parties should have a very good understanding of their own case and of their opponent's case. From a business point of view, resolving the case at this point would allow the parties to get back to selling burgers and to stop spending enormous sums on litigation expenses.
I expect the parties to make solid and good faith attempts to resolve this case before they embark on the expensive discovery and motion practice necessary to get this case ready for trial on the merits. During the preliminary injunction phase of this case, there were frequent disagreements over things that should have been resolved without much discord, and there were frequent accusations (and some evidence) of sandbagging and tactical abuse of the rules. If this behavior continues during the mediation period  by either party  I would not consider that to be good faith compliance with the referral to ADR. I expect both counsel to specifically discuss this paragraph with their clients, as I expect the clients to understand that sharp practices increase the expense of litigation.
I will stay all discovery and motion practice during the referral to mediation. The mediation will not be stayed in the event of an interlocutory appeal. If the mediation is not successful, I will set the case for a telephone scheduling conference and issue an additional Case Management Order, after consultation with counsel.
Accordingly,
IT IS HEREBY ORDERED that plaintiff's motion for preliminary injunction [# 40] is denied;
IT IS FURTHER ORDERED that defendant's motion to dismiss [# 29] is denied as moot.
IT IS FURTHER ORDERED that all motion practice and discovery in this case is stayed pending the completion of mediation.
A separate order referring this case to Alternative Dispute Resolution is entered this same date.
NOTES
[1] For ease of reference, I will refer to all plaintiffs as "Steak n Shake" and all defendants as Burger King, unless otherwise noted.
[2] A DMA is a specific media research area that is used by Nielsen Media Research to identify television stations whose broadcast signals reach a specific area and attract the most viewers. DMA boundaries are widely accepted and used by all types of companies to target and keep track of advertising.
[3] The parties dispute whether I should consider several third party use affidavits and other exhibits demonstrating such use. At this stage of the proceedings, I will consider such affidavits as well as other exhibits regarding third party use of the term "steakburger," because they are probative as to Steak n Shake's likelihood of success on the merits. My consideration of these affidavits at the preliminary injunction stage relieves neither party of the burden of proving its contentions at later stages of litigation.